[Nos. 39081, 39159.   En Banc.   January 11, 1968.]

KENNETH CARLSON, *Respondent*, v. THE CITY OF BELLEVUE, *Appellant*.*

*Reported in 435 P.2d 957.

*Derrill T. Bastian,* for appellant.

*Michael R. Donovan,* for respondent.

HAMILTON, J.—This appeal, like the appeal in *Shelton v. Bellevue,* filed concurrently herewith and reported in *ante* p. 28, 435 P.2d 949 (1968), involves a petition to rezone the property of respondent, Kenneth Carlson, from a residential classification to that of a business classification, thus permitting the erection of a gasoline service station. The property here involved is a rectan-

gular lot, 160 x 165 feet, lying in the southeast quadrant of the intersection of the Bellevue-Redmond Road and 148th Avenue, N.E., within the area annexed to the appellant, city of Bellevue, in April, 1964. A chronology of the procedures leading up to the adoption, by the city of Bellevue, of zoning ordinance No. 738 classifying respondent's, and other properties lying south of the Bellevue-Redmond Road, as R-S residential (a classification permitting multiple housing and nonretail business use) is recited in *Shelton v. Bellevue, supra,* and will not be repeated here, except as may be pertinent to the issues in this case.

The area annexed to the city of Bellevue in April, 1964, of which respondent's property is a part, was, prior to annexation, subject to the zoning regulations of King County. Between March, 1961, and April, 1964, respondent applied on three occasions to the King County Planning Commission and to the board of county commissioners for a rezoning of his property from S-1 (single residence) to B-1 (business). The first two applications were denied. On the third application, the zoning was changed to an R-3 classification, which is the same type of classification as R-S under the city of Bellevue's zoning ordinances.

After annexation the city continued the prevailing county zoning classifications in effect, under provisions of its comprehensive zoning ordinance, until such time as the requisite area study, planning, and public debate permitted the extension and application of its comprehensive community development plan to the annexed area. This was accomplished by ordinance No. 720, enacted on March 2, 1965, which, in turn, was implemented by zoning ordinance No. 738 enacted on April 20, 1965.

Meanwhile, and in November, 1964, respondent applied to the city of Bellevue for a rezoning of his property from the outstanding R-S classification to a B-1 classification. After making studies and holding a number of public hearings concerning the application, the city's planning commission recommended that the application be denied. The city council, likewise, after several public hearings and some vacillation, denied the application. Respondent thereafter,

and on November 22, 1965, sought review of the city council's action by way of petition for writ of certiorari in the Superior Court for King County. By his petition, respondent challenged the validity of the procedural steps leading up to the enactment of zoning ordinance No. 738 and asserted that the R-S classification placed upon his property thereby was arbitrary, capricious, unreasonable, confiscatory and void. The city was thereupon directed to make return to the superior court of all pertinent documents and records. This the city did, and the matter came on for hearing before the superior court in the early part of April, 1966.

The trial court, after reviewing the records before it, viewing the property, and hearing extended colloquy and argument of counsel, concluded that ordinance No. 738 had been validly enacted but that the zoning classification thereby applied to respondent's property was arbitrary, capricious, confiscatory, and void. Findings of fact, conclusions of law, and judgment were accordingly entered. The city then appealed. Respondent, however, filed with the city a request for a building permit and sought, in superior court, a writ of mandate compelling issuance of the permit. The superior court granted the writ of mandate, but afforded the city an opportunity to apply to this court for an order staying issuance of the permit until disposition of the appeal in the certiorari proceedings. This was granted and the city then gave notice of appeal in the mandamus proceedings. The two appeals were consolidated. The consolidated appeal was then heard before a department of this court, and thereafter set for reargument en banc with the case of *Shelton v. Bellevue, supra.*

We have, in the *Shelton* case, upheld the validity of the procedures leading up to Bellevue Zoning Ordinance No. 738 and the validity of that ordinance as it applied to the annexed territory embracing respondent's property. We need not now restate our reasons therefor.

The principal remaining issue raised by the respective contentions of the parties in the instant appeal revolve about the trial court's determination that the R-S zoning

classification as applied to respondent's property is arbitrary, capricious, confiscatory, and void.

In approaching this issue, it is essential to bear in mind that

> Zoning is a discretionary exercise of police power by a legislative authority. *Lillions v. Gibbs,* 47 Wn.2d 629, 289 P.2d 203 (1955). Courts will not review, except for manifest abuse, the exercise of legislative discretion. *State ex rel. Smilanich v. McCollum,* 62 Wn.2d 602, 384 P.2d 358 (1963). Manifest abuse of discretion involves arbitrary and capricious conduct. Such conduct is defined to be without consideration and in disregard of the facts. *State ex rel. Lopez-Pacheco v. Jones,* 66 Wn.2d 199, 401 P.2d 841 (1965); *State ex rel. Cosmopolis Consol. School Dist. No. 99 v. Bruno,* 61 Wn.2d 461, 378 P.2d 691 (1963). One who asserts that a public authority has abused its discretion and is guilty of arbitrary, capricious, and unreasoning conduct has the burden of proof. *State ex rel. Lopez-Pacheco v. Jones, supra; State ex rel. Longview Fire Fighters Union, Local 828 v. Longview,* 65 Wn.2d 568, 399 P.2d 1 (1965). If the validity of the legislative authority's classification for zoning purposes is fairly debatable, it will be sustained. *Euclid v. Ambler Realty Co.,* 272 U.S. 365, 71 L. Ed. 303, 47 Sup. Ct. 114, 54 A.L.R. 1016 (1926). *State ex rel. Myhre v. Spokane,* 70 Wn.2d 207, 422 P.2d 790 (1967) at 206.

In enacting zoning ordinance No. 738, the record indicates that the city of Bellevue, in accordance with its comprehensive development plan, is endeavoring to maintain an industrial "core" lying north of the Bellevue-Redmond highway, and, with that highway as a boundary line, phase out the commercial and business uses into prime residential areas lying to the south of the highway.

Respondent, however, points to the fact that two gasoline service stations occupy the two northerly quadrants of the intersection directly across from his property and that this, coupled with the fact that some preexisting business uses and some newly permitted ones in proximity thereto are allowed to operate south of the highway boundary, render the classification upon his property arbitrary and capricious. Furthermore, respondent contends, the fixing of the boundary line and the continuation of the R-S zoning clas-

sification upon his property, under the circumstances prevailing, diminishes the potential value of his property to such an extent as to render the zoning confiscatory. This is so, he asserts, because his property is located at a busy intersection, is adaptable to a gasoline service station use, and has been the subject of a $60,000 offer for such purpose, whereas it is worth little more than $2,500 as a multiple residence, nonretail or civic site.

The city, in response, argues that the phasing out process between business and residential areas is best accomplished by commencing the R-S classification at the selected boundary line, albeit some preexisting business islands are permitted to continue and to a limited extent expand within the R-S zone. The R-S classification, the city points out, permits multiple residences as well as nonretail business, professional and civic uses, and such together with the preexisting business islands, consisting primarily of a golf course and a shopping area, establishes an area wholly compatible with the modern "buffer zone" concept between prime residential and industrial areas. To permit the boundary line between the buffer zone and the industrial area to be breached by exempting respondent's property, the city claims, would do aught but open the door for continued intrusion of business uses into the buffer zone. Moreover, the city contends, since respondent's property has never been classified as other than residential, the continuation of such a classification imposes no overwhelming individual hardship as opposed to the benefits inuring to the area as a whole in preserving an orderly development. And, the city says, respondent suffers no greater diminishment in the value of his property than others similarly situated along the highway.

■ It is at once apparent from a review of the arguments of the parties, the history of respondent's various applications for a rezoning of his property, and the letters and petitions submitted by local area residents to the city council for and against respondent's rezoning application, that the issue is "fairly debatable." This should ordinarily end the matter, for as indicated in the quotation from *State*

*ex rel. Myhre v. Spokane, supra,* zoning is peculiarly within the province of the various legislative bodies empowered to act upon the matter, and courts should not, except in cases of manifest abuse of legislative discretion, seek to substitute their judgment for that of the legislative body.

However, as heretofore indicated, the trial court found and concluded, after viewing the premises, that the existence of the service stations across the highway from respondent's property, the operation and expansion of preexisting business uses south of the highway, together with the explosive growth being encountered in the area, and the unique potential worth of respondent's property as a service station site, compelled a holding that the boundary line as fixed and adhered to was arbitrary and confiscatory as it related to respondent's property.

In this respect, respondent vigorously contends that the trial court's findings are unchallenged, are supported by substantial evidence and are binding upon this court. We cannot agree.

■ In the first place, the trial court's view of the premises in the instant proceeding does not constitute extrinsic evidence over, above, and beyond that in the written record submitted to it for review. *Bishop v. Town of Houghton,* 69 Wn.2d 786, 420 P.2d 368 (1966); *Christensen v. Gensman,* 53 Wn.2d 313, 333 P.2d 658 (1958). Standing alone, such a view of the premises involved will not sustain a finding of fact, nor can it be utilized in a certiorari proceeding reviewing challenged legislative action, as a vehicle by which the trial court, as the initial reviewing court, may go outside the record in search of some supportive fact contended for but not revealed or embraced within the documents or records upon which its attention must be primarily focused and to which its attention should be limited. To permit such extraneous postlegislative fact finding to become the determinative fact in proceedings such as this would be to virtually invite the trial court to assert and superimpose its own observations and judgment upon those of the legislative tribunal and to foreclose any meaningful subsequent review of the trial court's determination.

In the second place, except for the view of the premises, the trial court's crucial findings and conclusions upon the issues presented to it rest upon the written record of the proceedings before the Bellevue Planning Commission and City Council. It did not have the advantage of seeing and listening to any witnesses. The appeal, therefore, from the trial court's judgment brings before us, in the same form and content, the identical documents and records presented to the trial court. Under these circumstances, we are not bound by disputed findings of the trial court to the same extent and in the same manner as where the trial court's findings rest upon the oral testimony of witnesses. *State ex rel. Pac. Fruit & Produce Co. v. Superior Court,* 22 Wn.2d 327, 155 P.2d 1005 (1945); *In re Black,* 47 Wn.2d 42, 287 P.2d 96 (1955); *Nygaard v. Department of Labor & Indus.,* 51 Wn.2d 659, 321 P.2d 257 (1958); *Chalmers v. Department of Labor & Indus.,* 72 Wn.2d 595, 434 P.2d 720 (1967). We are entitled to make our own examination of the records thus presented and determine the merits of the contentions going to the issue of arbitrary, capricious, and unreasonable legislative action.

We come then to the trial court's determination that the boundary line as fixed in the city's comprehensive development plan and its implementing zoning ordinance is arbitrary and capricious as it relates to respondent's property.

Patently, the fixing of boundary lines between use districts and areas is both a necessary and a delicate function. It involves the need for reasonable certainty in zoning boundaries as well as a balancing of the equities and inequities intrinsic in a situation where property upon opposite sides of a given line bear different use classifications. Nevertheless, a line must be drawn by someone at some point, and if zoning classifications are to be preserved with any degree of stability—and avoid constant erosion—the line as drawn must be reasonably maintained until neighborhood conditions and circumstances so change as to warrant legislative modification and alteration. In this vein, we subscribe to the position asserted by the Supreme Court of

Florida in *Miami Beach v. Wiesen,* 86 So. 2d 442 (Fla. 1956), as stated at 445:

. It is trite to observe that in zoning a city into various use districts there must be a dividing line somewhere. The selection of such a line involves the exercise of the legislative power and is a problem peculiarly within the power of the legislative body of a municipality. It involves a high degree of legislative discretion and an acute knowledge of existing conditions and circumstances. If the fairly debatable rule is a sound one, and we have so held, there is no situation in the field of zoning in which it is more applicable than that involving the decision of where the dividing line between use districts should be placed. Recognizing the fundamental premise that there must be a line somewhere, the courts should be highly respectful of the decision of the legislative body which, under the law, is vested with the power and charged with the duty of zoning. The courts should tread lightly in this field and then only where the actions of the City Council are so unreasonable and unjustified as to amount to confiscation of property.

For a further discussion of the subject of fixing boundaries between use districts see 8 E. McQuillin, Municipal Corporations § 25.90 (3d ed. rev. 1965); 1 A. Rathkopf, The Law of Zoning and Planning, ch. 13 (3d ed. 1966); 1 E. Yokley, Zoning Law and Practice § 4-17 (3d ed. 1965); C. Rhyne, Municipal Law § 32-6 (1957).

We are satisfied, under the circumstances as they appeared and were presented to the Bellevue City Council, that the fixing of the boundary line and the implementation of the "buffer zone" concept as applied to respondent's property cannot fairly be characterized as a manifest abuse of discretion. Concededly, we as individuals may entertain differing views as to the wisdom of varying facets of zoning, and reasonable minds can well differ, in the instant case, as to the propriety of the decision to "hold the line" for the time being at the highway and the intersection in question. But, because this may be so, it does not mean that the city council's decision is arbitrary or without a sound basis. It means, simply, that its decision, because of conflicting local views, was a difficult one to make—not that it

was a capricious one. In our view the trial court erred in holding the city council's action to be arbitrary.

There remains only the question of whether the city's action in denying respondent's request for a business classification upon his property imposed such a unique and undue economic hardship upon him as to, for that reason, render the city's action unreasonable and confiscatory.

There is little, if any, dispute of the fact that respondent has been offered a substantial sum for his property as a service station site. This no doubt holds true of other properties similarly situated in the area involved. However, it is also true that for some years past respondent's property has, as have other immediately surrounding and similarly situated properties, carried and sustained a residential and semi-residential use classification. Thus, in some measure, at least, and without intended censure, respondent's present contention of confiscation springs from the fact that the prevailing classification precludes him from immediately realizing the highest and most profitable use to which his property is now adaptable, rather than from the fact that the property is totally without value as previously and presently zoned. This, in turn, gathers nourishment from the fact that substantial and continuing growth in the surrounding Bellevue-Redmond area has been productive of an increasing volume of vehicular traffic moving on and off the Bellevue-Redmond highway at the various intersections feeding in and out of the commercial area to the north and the residential area to the south, thus making properties abutting upon and about the respective intersections more inviting to major oil companies and/or other business entrepreneurs.

The basic question so presented, however, reduces itself to when, in the point of time and the pressure of expanding population and commercial growth, will the prevailing zoning restrictions limit the potentials of respondent's property, as well as others similarly situated in the area, to such a point as clearly overcomes the considerations of public health, safety, and general welfare inherent in the municipality's desire to restrain the piecemeal and

gradual encroachment of business into the existing and comprehensively planned residential area and zone.

This type of question has, of course, been propounded in various forms and under a variety of circumstances since the inception of zoning in this country. Although the question has not been productive of any precise, definitive, all-satisfying yardstick by which a computer-like answer may be derived, it has, nevertheless, given rise to a generalized list of factors and an approach to the problem, which is best summarized in 8 E. McQuillin, Municipal Corporations § 25.45 (3d ed. rev. 1965), at 117, as follows:

> In determining whether or not a zoning ordinance is reasonable in its application to a given parcel of land, among the factors to be taken into consideration are the character of the neighborhood, existing uses and zoning of nearby property, the amount by which property values are decreased, the extent to which the diminution of values promotes the public health, safety, morals or welfare, the relative gain to the public as compared with the hardship imposed upon the individual owner, the suitability of the subject property for the purpose for which it is zoned, and the length of time the property has remained unimproved, considered in the context of the land development in the area. No single factor is controlling but each must receive due consideration. But to sustain an attack upon the validity of a zoning ordinance, an aggrieved property owner must show that if the ordinance is enforced the consequent restrictions on his property preclude its use for any purpose to which it is reasonably adapted. He is required to show that there is no possibility for profitable use under the restrictions of the ordinance, or alternatively that the greater part of the value of the property is destroyed by it, although there may be some slight use remaining. Adaptability, it has been declared, envisages economic as well as functional use, and assumes not the most profitable use, but that some permitted use can be profitable.

All factors being considered, as revealed by the record before us, we are satisfied that the respondent has failed to show that there is no present, possible, and reasonably profitable alternative use to which his property is adaptable under the R-S zoning classification it now bears.

The judgment of the trial court declaring ordinance No. 738 invalid as applied to respondent's property is accordingly reversed, and the subsequent judgment directing issuance of a building permit is vacated.

Appellant will recover its costs on appeal.

FINLEY, C. J., HILL, WEAVER, ROSELLINI, HUNTER, and HALE, JJ., and LANGENBACH, J., Pro Tem., concur.