[No. 49941–1. En Banc. January 11, 1985.]

THE ORION CORPORATION, *Respondent,* v. THE STATE OF WASHINGTON, ET AL, *Petitioners.*

442

*Kenneth O. Eikenberry, Attorney General, Charles B. Roe, Jr., Senior Assistant,* and *Wick Dufford, Assistant,* for petitioner State.

*William C. Smart, Henry Elsen, Keller, Rohrback, Waldo, Hiscock, Butterworth & Fardal, C. Thomas Moser, Prosecuting Attorney,* and *John Moffat, Chief Civil Deputy,* for petitioner Skagit County.

*Hillis, Phillips, Cairncross, Clark & Martin, P.S.,* by *Mark S. Clark* and *James J. Ragen,* for respondent.

BRACHTENBACH, J.—Padilla Bay lies east of Anacortes, Washington. It is an area of approximately 11,000 acres.

The uncontroverted record discloses fascinating details about this tidal land. The bay contains probably the largest and least disturbed stand of eelgrass on the West Coast of the United States with 73 percent of the bay covered by eelgrass beds. It supports the largest known wintering population of peregrine falcons in North America. Bald eagles winter in the area. Raptores are uniquely abundant. Merlin and snowy owls are frequently seen. Approximately 50,000 ducks of 26 species winter there. Over 200 species of birds have been observed, making Padilla Bay one of the most diverse areas for bird life in the state.

Its spring population of brants is the largest on the West Coast of the United States. The bay is the most important spring staging area for the Pacific flyway. The bay is critical because it is here that the brant build premigratory fat reserves before departing on their nonstop flight to Alaska. If Padilla Bay and the rich eelgrass beds it supports were

not available, the Pacific flyway population of brant would be greatly impacted.

It is an important spawning ground for a variety of fish, including herring, flatfish, various bait fish and salmonids. Harbor seals sport in the bay. Herons feed throughout the bay. The bay is also a nursery for dungeness crabs which are fished commercially.

In short, the Padilla Bay estuary is recognized as the most diverse, least disturbed, and most biologically productive of all the major estuaries on Puget Sound. In view of the foregoing, it is not surprising that when the State enacted the Shoreline Management Act of 1971, RCW 90.58.010 *et seq.*, the Legislature specifically classified Padilla Bay as one of five shorelines of statewide significance. *See* RCW 90.58.030(2)(e)(ii)(E).

Eighty percent of the tidelands of Padilla Bay are under the private control of the plaintiff The Orion Corporation (hereinafter Orion). Unfortunately, Orion's plans for their holdings conflicted with the State's plans for Padilla Bay. That conflict led to this lawsuit and appeal.

In 1982, Orion sued the State, a number of state officials, Skagit County and its county commissioners. Plaintiff alleged five causes of action: (1) inverse condemnation; (2) an arbitrary and unreasonable interference with plaintiff's use of property violative of due process; (3) denial of equal protection by imposition of restrictions more burdensome than those upon others similarly situated; (4) a breach of obligation contained in a deed from the State; and (5) a 42 U.S.C. § 1983 violation. Plaintiff also sought attorney's fees under 42 U.S.C. § 1988 and RCW 8.25.075.

The defendants moved for summary judgment, arguing principally that Orion had failed to exhaust available administrative remedies. The trial court denied the defendants' motion, holding that Orion had proven conclusively, by uncontroverted facts, that pursuing the available administrative procedures would be futile and impractical. We granted discretionary review and affirm.

## I

The dispositive issue is whether the plaintiff must first exhaust the available administrative remedies before instituting this action.[1] To decide that issue a rather lengthy factual analysis, drawn from the comprehensive record compiled by Orion, is necessary.

The regulatory process that currently affects Orion's Padilla Bay holdings is complex. The following programs impact any development plans for Padilla Bay:

Padilla Bay Estuarine Sanctuary;

Coastal Zone Management Act of 1972 (16 U.S.C. § 1461);

Shoreline Management Act of 1971 (RCW 90.58);

Skagit County Shoreline Management Master Program;

Washington State Coastal Zone Management Program. This list is not exclusive. Pertinent sections of the various programs and the history of this case are summarized below.

In the 1960's Orion began acquiring the second class tidelands in Padilla Bay. Padilla Bay is composed of such tidelands. Ultimately, Orion acquired approximately 5,600 acres in fee and held options on an additional 3,500 acres. Thus, it owned or held options on 80 percent of Padilla Bay. At the time of the initial acquisition, these tidelands were not zoned.

Orion acquired this property with a plan to establish a residential Venetian style community, estimated to ultimately have a population of 30,000, with supporting retail, commercial and recreational facilities. Orion completed detailed concept planning and engineering studies to check physical development feasibility. Orion's detailed plans called for a combined dredge and fill operation to create the

---

[1]Citing *Patsy v. Board of Regents*, 457 U.S. 496, 73 L. Ed. 2d 172, 102 S. Ct. 2557 (1982), Orion argues that it need not exhaust available administrative remedies before litigating its 42 U.S.C. § 1983 claim. Due to our disposition of this case we need not decide this issue.

community. Needless to say, such an enterprise would have significantly altered the environmental character of Padilla Bay.

Before Orion could proceed with its development plans, the State enacted the Shoreline Management Act of 1971, Laws of 1971, 1st Ex. Sess., ch. 286, § 1, p. 1496, codified at RCW 90.58.010 *et seq.* (hereinafter SMA). The SMA mandated that local governments develop master programs for shorelines within their jurisdictions. These programs were subject to Department of Ecology (hereinafter Ecology) approval and, once approved, were to become the regulations for state shorelines. The act authorized Ecology to develop guidelines to serve as interim regulations. Ecology's guidelines were also designed to guide the formation of each local master program. RCW 90.58.050–.100.

The Legislature delineated use preferences to guide the formation of both Ecology guidelines and local master programs. Of particular importance are the legislative declarations for shorelines of statewide significance.

The legislature declares that the interest of all of the people shall be paramount in the management of shorelines of state–wide significance. The department, in adopting guidelines for shorelines of state–wide significance, and local government, in developing master programs for shorelines of state–wide significance, shall give preference to uses in the following order of preference which:

(1) *Recognize and protect the state–wide interest over local interest*;

(2) *Preserve the natural character of the shoreline*;

(3) Result in long term over short term benefit;

(4) *Protect the resources and ecology of the shoreline*;

(5) Increase public access to publicly owned areas of the shorelines;

(6) Increase recreational opportunities for the public in the shoreline;

(7) Provide for any other element as defined in RCW 90.58.100 deemed appropriate or necessary.

(Italics ours.) RCW 90.58.020.

Padilla Bay, as a shoreline of statewide significance, is

subject to these seven use preferences. As will become evident, the State has made a policy choice for Padilla Bay that accords with the italicized use preferences: to recognize and protect the statewide interest, preserve the natural character of the bay, and protect its resources and ecology.

Ecology's development guidelines/interim regulations applicable to shorelines of statewide significance state:

> Because these shorelines are major resources from which all people in the state derive benefit, the guidelines and master programs must give preference to uses which favor public and long–range goals.

WAC 173–16–040(5). The section further provides that areas containing unique or fragile natural resources should be left undeveloped. *See* WAC 173–16–040(5)(d)(i). General development guidelines for estuaries state:

> An estuarine area left untouched by man *is rare* since historically they have been the sites for major cities and port developments. Because of their importance in the food production chain and their natural beauty, the *limited estuarial areas require careful attention in the planning function.* Close scrutiny should be given to all plans for development in estuaries which reduce the area of the estuary and interfere with water flow.

(Italics ours.) WAC 173–16–050(5).

Orion abandoned its Venetian style development plans without submitting a permit application. Orion believed these plans were precluded by the passage of the SMA in 1971. Statements by state, county and federal officials supported that belief. In 1973, the then director of the Skagit County planning department testified that development of Orion's property would be impossible at that time as the SMA would prevent any development. In 1974, the Department of Game opposed the renewal of a private individual's permit to remove sand and gravel from the bed of Padilla Bay. A department official noted that with passage of the environmental acts and the classification of Padilla Bay as a shoreline of statewide significance, it was doubtful that the individual's development plans would be carried out. The official closed his letter by saying that "[b]ecause of

the substantial impact that development in Padilla Bay would have on the fish and wildlife resources of the area, the Department of Game will strongly oppose any such project."

In 1975, the Board of Skagit County Commissioners sent a letter to the United States Fish and Wildlife Service (hereinafter USFWS) regarding relocation of a lime company. The Board therein expressed its policy concerning industrial expansion into Padilla Bay.

> Be assured that the Board of Commissioners of Skagit County has no intention whatsoever of allowing industry to expand into the prime agriculture areas of the county, *nor into the critical areas of Padilla or Skagit Bays.*

(Italics ours.)

In April of 1976, a USFWS biologist, Brian Sharp, filed a trip report regarding potential uses for Padilla Bay. The Skagit County planning department informed Sharp that its director, Bob Schofield, was on record as saying that the only use for the bay would be aquaculture. Mr. Schofield is also director of the Skagit County permit center and a Skagit County hearing examiner. In those capacities, he reviews applications for substantial development permits under the Skagit County Shoreline Management Master Program. The Department of Game told Mr. Sharp that for years Padilla Bay had been the State's number one acquisition property and asked how the Department could help protect the bay. The chief of planning for the Army Corps of Engineers told Mr. Sharp that the Corps' reaction to Orion's development plans would be negative.

Orion's belief that development of Padilla Bay was foreclosed was reinforced when Ecology approved and adopted the Skagit County Shoreline Management Master Program (hereinafter SCSMMP) on October 5, 1976. *See* WAC 173–19–370. At that point the SCSMMP became the principal, though not exclusive, land use plan applicable to Orion's property. The SCSMMP designated Orion's property as aquatic. Orion's Venetian style development plans were foreclosed because commercial and residential develop-

ments are prohibited in aquatic areas. SCSMMP ch. 7.03(2)(A)(6), (B)(1); ch. 7.13(2)(A)(6). David Rodney Mack, assistant director of Ecology, testified in his deposition that Padilla Bay is an estuary, is a unique area and is one of the most biologically productive areas in the Puget Sound. Therefore, the SCSMMP's use categories for aquatic areas, and estuaries in particular, are summarized in the appendix.

As this summary indicates, the only permitted use of Orion's property under the SCSMMP is less intensive, nonstructural and nonextractive recreational activities. As a shoreline of statewide significance, aquaculture would be allowed but only if an applicant could first obtain a conditional use permit. All other potential uses either "should not" be allowed in estuaries or are "prohibited" in aquatic or estuary areas.

In June of 1976, just prior to adopting the SCSMMP, Ecology issued the Washington State Coastal Zone Management Program (hereinafter WSCZMP). This program also impacts Orion's land. The program was in response to the federal Coastal Zone Management Act of 1972, 16 U.S.C. §§ 1451–1464, which authorized federal grants *to encourage and assist coastal states in the development of management programs* for the land and water resources of its coastal zone. 16 U.S.C. §§ 1452, 1454.

Under the WSCZMP certain areas of the state were designated as areas of particular concern.

The . . . principle used here for identification of areas of particular concern is that *such areas must be of greater than local interest* and offer a live issue of competing uses and management options. More specifically, selection of the areas of particular concern discussed below has been guided by the following criteria: (1) the area *contains a resource feature of environmental values considered to be of greater than local concern or significance*; (2) the area is given recognition as of particular concern by state or federal legislation, administrative and regulatory programs, or land ownership; and (3) the area has the potential for more *than one major land or water*

*use or has a resource being sought by ostensibly incom-patible users.*

(Italics ours.) WSCZMP, at 12. Padilla Bay was included as one area of particular concern. WSCZMP, at 12.

The WSCZMP stated that "[t]he estuary of the Skagit River [Padilla Bay] is the most diverse, least disturbed, and most biologically productive of all the major estuaries on Puget Sound." WSCZMP, at 16. The program also noted indirectly Orion's ongoing interest in Padilla Bay:

> While there would appear to be few threats to the pro-tection of these valuable wetlands [Skagit and Padilla Bays], there remain some concerns. . . . [P]lans have been developed several times for diking the area, first for farming and later for industrial development. In fact, detailed plans that have now been abandoned were even developed for a combined dredge and fill operation to create a Venice–style residential area.

WSCZMP, at 17. While the WSCZMP designated Padilla Bay as an area of particular concern, it imposed no overlay of regulation itself, and thus imposed no use restrictions on Orion's property. However, coupled with the SMA, this program is direct evidence that Padilla Bay (Orion's prop-erty) is recognized as an area that contains a resource fea-ture of environmental value that is of greater than local concern. *See* RCW 90.58.020(1).

The net effect of these developments was that Orion's property in Padilla Bay, which had originally been sold as unzoned tidelands for commercial development, was desig-nated by name as a shoreline of statewide significance under the SMA, recognized as an area of particular concern under the Washington State Coastal Zone Management Program, and designated as aquatic under the SCSMMP, with commercial and residential development prohibited.

Orion's efforts at finding alternative uses for its land proved fruitless. It analyzed diking its property and turning it into farmland. It found this to be an economically feasi-ble plan but was informed by state and county officials that it would not be issued permits for that development. Agri-

cultural use is not permitted in aquatic areas under the SCSMMP. SCSMMP ch. 7.01(2)(A)(6). No permit application for this potential project was filed. Orion also investigated clam harvesting, oystering or harvesting eelgrass and other forms of marine aquaculture. Aquaculture is a conditional use in aquatic shorelines of statewide significance. SCSMMP ch. 7.02(2)(A)(6)(3), (B)(11). Studies indicated that these plans were not economically feasible. Similarly, no permit application was filed.

Finally, Orion considered selling its land to the State. Ecology, lacking funds for acquiring Orion's property, asked the USFWS to include the purchase in the federal list of western purchases. The USFWS responded:

> I would be less than candid with you if I did not share the current thinking of the concerned Bureaus that the combination of existing State and Federal regulations, as they are presently implemented, should adequately protect the ecological resources of Padilla Bay. Even if the various State permits were somehow acquired to dike and develop this area, the non–water–dependent nature of the proposed Orion development (agricultural) would almost certainly preclude the issuance of a Corps of Engineers Section 10 or 404 permit, according to my information.

> Of course, the requirements and relative strength of existing laws may change in the future and become less effective. Should this occur, and the area becomes significantly more threatened, Federal acquisition would certainly be more actively considered as an immediate priority.

Letter from Juanita Alvarez, special assistant to the assistant secretary for Fish and Wildlife and Parks, to Wilbur G. Hallauer, Director of Ecology. Thus, the USFWS refused to fund any acquisition plans.

The existing state and federal regulations to which Ms. Alvarez referred were considerable. Besides the aforementioned programs, any development of Orion's property would require permits from the Army Corps of Engineers. *See, e.g.,* the federal Water Pollution Control Act, 33 U.S.C. § 1344; *see also* Rivers and Harbors Appropriation Act of

1899, 33 U.S.C. § 403. Review of Corps permits is performed by the local governmental jurisdiction in which the permit is being sought as well as by seven state agencies. Ecology coordinates the review process. WSCZMP, at 27. Corps of Engineers regulations provide that when state and/or local permit applications are denied, the Corps will also deny the applications. *See* 33 C.F.R. § 320.4(j) (1983). Orion's property was also subject to programs jointly administered by the Department of Fisheries and the Department of Game. *See, e.g.,* RCW 75.20.100 (hydraulic project approval program); *see also* WAC 220–110–010 *et seq.* (hydraulic code rules). Additionally, the State Environmental Policy Act of 1971, RCW 43.21C.010 *et seq.,* applies to any development proposal.

After receiving Ms. Alvarez's letter, Ecology director Hallauer wrote to Governor Ray informing her that the Department of Interior had refused their funding request. In this letter he stated:

> The sense of the federal position is that they see no point in paying for the property as it is frozen into nondevelopment posture by the effect of CZM and the Washington State Shoreline Act.
> This attitude reflects a taking of unfair advantage by government. The owners have been deprived of property rights by government action—in fairness, there should be an attempt to compromise on the "taking" issue.

As Orion investigated means of developing its Padilla Bay property, local and state agencies continued to look into methods of protecting the bay in its natural state. The result of those efforts is the final and determinative land use program that directly impacts Orion's property: the creation of the Padilla Bay Estuarine Sanctuary. Creation of this sanctuary is direct evidence of the State's conclusion and plan that the estuary of Padilla Bay remain undeveloped.

During 1978, Ecology began a project to create the Padilla Bay Estuarine Sanctuary. Under the federal Coastal Zone Management Act of 1972, the Secretary of Commerce

may make grants to states for the purposes of acquiring, developing, or operating estuarine sanctuaries. Such grants are not to exceed 50 percent of the total cost involved. 16 U.S.C. § 1461. Pursuant to this section, Ecology put together a grant proposal for creating the Padilla Bay Estuarine Sanctuary. The program called for public owner-ship of Padilla Bay.

The Padilla Bay Estuarine Sanctuary steering committee was formed to guide the creation of the sanctuary and was composed of officials from local and state agencies. The steering committee looked at several sites as possible sanc-tuaries before selecting Padilla Bay. The ownership pattern of the bay made it easier to acquire than any other areas where ownership was "incredibly fragmented." When the sanctuary was in the planning stages, Ecology's assistant director stated that acquisition of the Orion holding would be the first order of business.

Ecology officials who met with Robert Schofield, Skagit County planning director, found him to be an early sup-porter of the sanctuary. Mr. Schofield agreed to support the project before the county commissioners and stated that the commissioners would favor the sanctuary. Schofield "discussed the alternative use of Padilla Bay—(Orion Development Corporation) and indicated that the retention of the area in its natural state would be preferable to the commercial development planned by Orion[.]" Mr. Bud Norris, present Skagit County commissioner, testified in his deposition that he endorsed the bay's designation as a sanctuary and the designation denoted its need for protec-tion.

During the planning stages, Ecology proposed that the sanctuary be appropriated by utilizing the "willing seller" concept. Ecology's appraisal concluded that Orion's prop-erty had a value of $80 per acre as marginal oyster land. Orion had previously rejected offers of $90 per acre and $110 per acre. Noting that the value of the land appeared to be decreasing, Orion also rejected this offer. (An inde-pendent appraisal of the land, performed at Orion's

request, valued it as $1,200 per acre as diked farmland.)

On April 4, 1980, the Legislature passed Engrossed Senate Bill 3371, appropriating matching funds, as required under 16 U.S.C. § 1461, to purchase tidelands for the establishment of the Padilla Bay Estuarine Sanctuary. Laws of 1980, ch. 180, § 1, p. 610. The act did not designate any specific property as constituting the sanctuary but did specifically authorize regulated hunting, fishing, boating, and noncommercial taking of shellfish on the sanctuary.

In July of 1980, the final environmental impact statement (hereinafter EIS) for the proposed estuarine sanctuary grant was filed with the Department of Commerce. This EIS identified the proposed sanctuary as comprising approximately 11,000 acres of Padilla Bay. All of Orion's property holdings were included within the proposed sanctuary boundaries.

The National Oceanic and Atmospheric Administration, which oversees the federal Coastal Zone Management Act of 1972, issued regulations for the administration of estuarine sanctuaries. The purpose of the program is to create *natural field laboratories* in which to gather data and make studies of the natural and human processes occurring within the estuaries of the coastal zone. The *primary use* of estuarine sanctuaries shall be for *research* and *educational purposes*. 15 C.F.R. § 921.3 (1984). While multiple uses are possible in estuarine sanctuaries, such compatible uses are generally low intensity recreation, fishing, hunting and wildlife observation. 15 C.F.R. § 921.5(a) (1984). Moreover,

(b) There shall be no effort to balance or optimize uses of an estuarine sanctuary on economic or other bases. *All additional uses of the sanctuary are clearly secondary to the primary purpose and uses, which are long–term maintenance of the ecosystem for scientific and educational uses.* Non–compatible uses, including those uses which would cause significant *short or long–term ecological change* or would otherwise detract from or restrict the use of the sanctuary as a natural field laboratory, *will be prohibited.*

(Italics ours.) 15 C.F.R. § 921.5(b) (1984). Lastly, management of estuarine sanctuaries is the responsibility of the State or its agent. Any management program, however, must be in conformance with the federal regulations and guidelines. 15 C.F.R. § 921.30 (1984). Thus, the state management program *must* ensure *"long–term maintenance of the ecosystem for scientific and educational uses."*

The Padilla Bay Estuarine Sanctuary officially came into being August 29, 1980. The federal government granted $1.2 million to the State for property acquisition and construction of an interpretative center on the 11,600–acre site. Wash. Dep't of Ecology, *Shoreline/Coastal Zone Management* (Sept. 1980). The interpretative center was dedicated in September of 1982. State maps at the center depict the 11,600–acre sanctuary as including all 9,600 acres controlled by Orion. These maps included Orion's property holdings within the proposed sanctuary despite the fact Orion has not been a "willing seller".

Despite the state development and advertisement of the sanctuary, Orion continued to negotiate with the State over selling its land but the parties were unable to agree on a price. Finally, Orion instituted the present suit.

Orion alleged principally that the county and state activity amounted to an unconstitutional taking by inverse condemnation. Under three alternative theories (1) a de facto taking, (2) a taking–oppressive precondemnation activity, and (3) a taking by overregulation.

The State and County answered and moved for summary judgment, arguing that Orion's complaint should be dismissed for failure to first exhaust administrative remedies. The State also argued that Orion lacked standing.

In opposition, Orion contended that it had no administrative remedies against the defendants' sanctuary activities. Orion also argued that it need not exhaust futile and inadequate administrative remedies. It alleged that the numerous regulatory schemes and the attitudes of various agencies involved made it clear that Orion will not be allowed to develop its property and, therefore, the available

administrative remedies were inadequate and futile.

## II

The State first argues that Orion does not have standing to maintain this action. As to Orion's de facto taking argument, the State contends that its sanctuary activity is merely an attempt to buy land and not an invasion of Orion's land. Similarly, the State argues that Orion lacks standing to claim oppressive precondemnation activity because no plan or attempt to condemn has been announced or pursued. The State concludes that since Orion lacks standing to raise these claims, the entire suit rests on Orion's overregulation claim, to which Orion must first exhaust administrative remedies.

■ We do not agree. To have standing, one must have some protectable interest that has been invaded or is about to be invaded. *Vovos v. Grant,* 87 Wn.2d 697, 555 P.2d 1343 (1976); *State ex rel. Hays v. Wilson,* 17 Wn.2d 670, 137 P.2d 105 (1943). Orion alleged that the State's sanctuary activities have interfered with its property rights. *Cf. Pruneyard Shopping Ctr. v. Robins,* 447 U.S. 74, 82 n.6, 64 L. Ed. 2d 741, 100 S. Ct. 2035 (1979) (within meaning of taking clause, property includes the entire group of rights inherent in ownership). Orion, which owns the land that has been allegedly taken without just compensation, has standing to raise those claims. The State's arguments go to the merits of Orion's claims. The trial court did not address the merits of Orion's claims and those issues are not before us.

## III

Although the trial court found that Orion had no administrative remedies available to contest the petitioners' sanctuary development, the petitioners argue that such remedies are available under the SCSMMP. Petitioners' position is that the SCSMMP is the only regulatory scheme directly applicable to Orion's property because Orion has refused to sell its land to the State. Therefore, the property is not within the estuarine sanctuary and not subject to the

sanctuary regulation. Petitioners conclude that if the SCSMMP can eliminate the effects of the sanctuary development, then Orion has administrative remedies available to it.

Petitioners assert that the SCSMMP provides a legally adequate remedy which Orion must pursue and has admittedly failed to pursue. Orion has sought neither a variance nor a conditional use permit although both are potentially available. Petitioners argue that because either a variance or conditional use permit could alleviate any harmful consequences of the program, failure to pursue these administrative remedies bars Orion from maintaining this suit. *Ackerley Communications, Inc. v. Seattle,* 92 Wn.2d 905, 911, 602 P.2d 1177 (1979), *cert. denied,* 449 U.S. 804 (1980); *accord, Lange v. Woodway,* 79 Wn.2d 45, 48, 483 P.2d 116 (1971).

It is a general rule that when an adequate administrative remedy is provided, it must be pursued before the courts will intervene. *Wright v. Woodard,* 83 Wn.2d 378, 381, 518 P.2d 718 (1974). If the administrative mechanisms available can alleviate the harmful consequences of the governmental activity at issue, a litigant must first pursue those remedies before resort to the court. *Lange v. Woodway, supra* (variance available but not sought); *accord, Ackerley Communications, Inc. v. Seattle, supra* (variance available but not sought). This is particularly true in land use cases where the matter in question involves an act of legislative discretion. *Lange,* at 48.

As the cases make clear there is a strong bias toward requiring exhaustion before resort to the courts. This court recently noted that the policies underlying the exhaustion doctrine are to (1) insure against premature interruption of the administrative process, (2) allow the agency to develop the necessary factual background on which to base a decision, (3) allow the exercise of agency expertise, (4) provide a more efficient process and allow the agency to correct its own mistake, and (5) insure that individuals are not encouraged to ignore administrative procedures by resort to

the courts. *South Hollywood Hills Citizens Ass'n v. King Cy.*, 101 Wn.2d 68, 73, 74, 677 P.2d 114 (1984).

 Although these policies strongly favor exhaustion, this court has recognized that the doctrine is not absolute.

Washington courts have recognized exceptions to the exhaustion requirement in circumstances in which these policies are outweighed by consideration of fairness or practicality. For example, if resort to the administrative procedures would be futile, exhaustion is not required. *Zylstra v. Piva*, 85 Wn.2d 743, 539 P.2d 823 (1975).

*South Hollywood Hills Citizens Ass'n,* at 74.

We believe that in this case, considerations of fairness and practicality outweigh the policies underlying the doctrine. We are convinced that on this record, resort to the administrative procedures would be futile and vain. *Zylstra v. Piva*, 85 Wn.2d 743, 539 P.2d 823 (1975).

If we were to look solely at the Skagit County Shoreline Management Master Program, as the petitioners argue, we might be forced to agree with their position. However, the petitioners ask us to ignore the record in this case. The record reveals that the State has made a conscious policy choice to preserve Padilla Bay in its natural state. Moreover, the record reveals much more than a policy choice; the record shows that choice coming to fruition by the creation of the Padilla Bay Estuarine Sanctuary.

Without Orion's property, there can be no estuarine sanctuary. The record makes it abundantly clear that to require Orion to seek a development permit would "require them to pump oil from a dry hole." *Ogo Assocs. v. Torrance*, 37 Cal. App. 3d 830, 834, 112 Cal. Rptr. 761 (1974). *See also Dooley v. Town Plan & Zoning Comm'n*, 151 Conn. 304, 197 A.2d 770 (1964).

A willingness to consider an application is irrelevant if there is no hope of success if one is submitted. Prior decisions have required exhaustion after finding that no showing as to futility or inadequacy was made. *See, e.g., Wright v. Woodard, supra* at 382 (no showing or facts advanced showing unfairness or impartiality); *Ackerley Communica-*

*tions, Inc., supra* at 911 (no showing remedy is unavailable or inadequate); *Lechelt v. Seattle,* 32 Wn. App. 831, 836, 650 P.2d 240 (1982) (no showing bringing administrative action useless). That is not the case here.

The futility exception to the exhaustion doctrine is premised upon the rationale that courts will not require vain and useless acts.

> Clearly, the administrative remedies which must be exhausted are only those which promise adequate and timely relief. If the available administrative remedies are inadequate, or if they are vain and useless, they need not be pursued before judicial relief is sought.

(Footnotes omitted.) 4 R. Anderson, *Zoning* § 26.10 (2d ed. 1977). Thus, futility goes beyond legal adequacy and addresses factual adequacy. However, contrary to the petitioners' argument, futility addresses more than a direct showing of bias or prejudice on the part of discretionary decision makers. While rare, futility can be demonstrated by the factual circumstances of a particular case. Such a unique set of facts is found in this case.

Orion argues that there is no present, possible and reasonably profitable alternative use to which its property is adaptable. *See Carlson v. Bellevue,* 73 Wn.2d 41, 435 P.2d 957 (1968). A substantial development permit will not be issued unless consistent with the applicable master program and the SMA. RCW 90.58.140(2)(b). Under the Skagit County Shoreline Management Master Program and Ecology's regulations under the SMA, only two uses are potentially conceivable on Orion's property, aquaculture and recreational use.

Recreation must be limited to nonintensive, nonextractive and nonstructural activities. SCSMMP ch. 7.12(2)(b)-(4). Sanctuary regulations, while not directly applicable to Orion's property as of yet, permit only nonintensive recreational uses on Padilla Bay. *See* 15 C.F.R. § 921.5 (1984). Such uses would provide Orion no economic return.

Aquaculture would require the issuance of a conditional use permit. A variance or conditional use permit may be

lawfully granted only within the guidelines set forth in the zoning ordinance. *Lewis v. Medina,* 87 Wn.2d 19, 22, 548 P.2d 1093 (1976). To obtain a conditional use permit an applicant must meet *all* the following criteria:

 *a.* That the proposed use *will be consistent with the policies of this Master Program and policies of RCW 90.58.020.*

 *b.* That the proposed use will not interfere with the normal public use of public shoreline.

 *c.* That the proposed use of the site and design of the project *will be compatible with other permitted uses in the area.*

 *d.* That the proposed use *will cause no unreasonable adverse effects to the shoreline environment designation* in which it is located.

 *e.* That the *public interest suffers no detrimental effect.*

(Italics ours.) SCSMMP ch. 11.03. Variance criteria are even stricter. *See* SCSMMP ch. 10.03(2).

Orion's land has been designated a shoreline of statewide significance, RCW 90.58.030(2)(e)(ii)(E); recognized as an area of statewide concern under the Washington State Coastal Zone Management Program; and included in an estuarine sanctuary that is dedicated to long–term maintenance of the ecosystem. Moreover, the public interest under the SMA is that unique and fragile natural resource areas are to be left undeveloped. WAC 173–16–040(5)(d)(i). Any conditional use permit must be compatible with these designations and ensure that the public interest suffer no detrimental effect.

There is no doubt that Padilla Bay is a unique and fragile natural resource area. Moreover, any use must be compatible with permitted activities in the area and not cause adverse effects to adjacent properties. The permitted use in the area and the adjacent property is the Padilla Bay Estuarine Sanctuary. Thus, no aquaculture permit would be issued if incompatible with sanctuary activities: research and recreation.

Moreover, the State's own appraisal states that Orion's property's highest and best use would be marginal oyster

land. However, the appraisal suggests that only 200 to 300 acres of Orion's tract would be suitable for oystering. The appraisal also states that Padilla Bay is expected to be farmed best with bottom culture and hydraulic harvesting. Yet hydraulic harvesting is not permitted in areas with significant quantities of eelgrass. "Harvesting in Eelgrass Clarified," Wash. Dep't of Ecology, *Shoreline/Coastal Zone Management* vol. 5, No. 3 (Sept. 1980). Padilla Bay contains the largest and least disturbed stand of eelgrass left on the West Coast of the United States. Moreover, removal or dredging of bottom materials for shellfish harvest is prohibited on shorelines of statewide significance under the SCSMMP. *See* SCSMMP ch. 7.02(2)(A)(6)(3), (B)(11).

We are aware of the admonition contained in *King v. Seattle*, 84 Wn.2d 239, 252–53, 525 P.2d 228 (1974) which is appropriately restated here.

> We are mindful, nonetheless, of the potential for abuse which legal process may serve in the hands of public officials, bankrolled with public funds, who seek to achieve by delay and the necessity for costly court suits or administrative hearings what they cannot achieve on the merits—the frustration of private citizens' legally protected activity.

*King,* at 252–53.

Reviewing this record it becomes quite evident that the State and County have made a policy choice to prevent development of Padilla Bay. The creation of the Padilla Bay Estuarine Sanctuary makes this evident. Even assuming that the sanctuary regulations may not be binding upon the County, the County cannot successfully argue that the sanctuary designation would not have a direct bearing on their decisionmaking, rendering any permit application a vain and useless act. We so hold.

## IV

As a final matter, in support of its motion, Orion filed the affidavit of Mr. Peter L. Buck. Mr. Buck, an attorney testifying as an expert witness, reviewed all exhibits filed in the case and all regulations applicable to Orion's property. His

affidavit stated that Orion would never be granted a substantial development permit; and if one was granted it would be appealed and overruled by the Shorelines Hearings Board. He also concluded that under the SCSMMP and Ecology's regulations no variance or conditional use permits were available to Orion. He also stated that to pursue the administrative remedies would take at least 2 years and cost over $200,000. The defendants objected to the Buck affidavit and moved to strike it as speculative, argumentative and a legal opinion.

The trial court, after reviewing the affidavit, denied the motion to strike Buck's affidavit. The court, in its discretion, admitted the Buck affidavit, noting any objection to it went to its weight rather than admissibility.

The affidavit of Mr. Buck was made on personal knowledge and contained a proper foundation outlining his expertise to testify as an expert witness. Additionally, all exhibits he refers to within his affidavit were part of the record before the trial court. Thus, there was compliance with CR 56(e); *see also Meadows v. Grant's Auto Brokers, Inc.,* 71 Wn.2d 874, 431 P.2d 216 (1967). The petitioners argue, however, that the affidavit was based upon speculation and legal opinion and, therefore, should not have been considered by the trial court. *American Linen Supply Co. v. Nursing Home Bldg. Corp.,* 15 Wn. App. 757, 551 P.2d 1038 (1976). Experts are not to state opinions of law. Comment, ER 704.

■ Orion argues that Mr. Buck testified as an expert witness. He testified to a factual matter, whether any permit application would be a futile gesture. He also detailed the interplay of the various regulations in the record. Such opinion testimony is admissible if it will assist the trier of fact to understand the evidence or determine a fact in issue. ER 702. Such testimony is admissible even if it embraces an ultimate issue to be decided by the trier of fact. ER 704. Moreover, Mr. Buck testified as to the costs and time of pursuing the administrative process. To the extent the affidavit contained legal conclusions it is to be

disregarded but the rest of the affidavit can properly be considered. *American Linen Supply Co. v. Nursing Home Bldg. Corp., supra.*

This is a very close call. Qualifications of expert witnesses are to be determined by the trial court within its sound discretion and rulings on such matters will not be disturbed except for a manifest abuse of discretion. *State v. O'Connell,* 83 Wn.2d 797, 816, 523 P.2d 872 (1974). *See also Ball v. Smith,* 87 Wn.2d 717, 725, 556 P.2d 936 (1976). There is no abuse of discretion shown in this case. The trial court admitted Mr. Buck's affidavit, noting that the objections went to the weight rather than the admissibility. While the conclusions of law contained in the affidavit are improper, the court must be presumed to have ignored these conclusions. There were factual conclusions in the exhibit which the court could consider. Moreover, courts indulge in some leniency with respect to affidavits presented by the nonmoving party. *Meadows v. Grant's Auto Brokers, Inc., supra* at 879.

The trial court is affirmed and the case is remanded for a trial on the merits.

### Appendix

1. Agriculture (ch. 7.01): Prohibited. 7.01(2)(A)(6), at 7–4.

2. Aquaculture (ch. 7.02): At shorelines of statewide significance: Removal of bottom material for shellfish harvest is prohibited; all other aquaculture operations and developments require a conditional use permit. 7.02(2)(B)(11), at 7–11. Estuaries should be protected to sustain and foster their natural productivity. 7.02(C), at 7–7.

3. Commercial Development (ch. 7.03): Prohibited except for commercial docking and boat filling stations, 7.03(2)(A)(6), (B)(1), at 7–16, and it should be located away from estuaries and tidelands. 7.03(1)-(C)(3), at 7–13.

4. Dredging (ch. 7.04): Should not occur in estuaries, natural wetlands, and marshes. 7.04(1)(B)(1)(a), at 7–20.

5. Forest Management Practices (ch. 7.05): Prohibited (with exceptions not relevant here). 7.05(2)(A)(6), at 7–30.

6. Landfills (ch. 7.06): Prohibited except as a conditional use for water and shoreline dependent development consistent with the master

program, 7.06(2)(6), at 7–35, but they should not be located in estuaries, natural wetlands, and marshes. 7.06(1)(B)(1)(b), at 7–33.

7. Marinas and Launch Ramps (ch. 7.07): Should not be located where shellfish and aquacultural resources are adversely affected or where shellfish and wildlife habitats and migratory routes would be adversely affected. 7.07(1)(B)(3)(c), (d), at 7–38. They also should not be located in estuaries, natural wetlands, tidelands, and fish and shellfish spawning and rearing areas. 7.07(1)(C)(1), at 7–39. In any event, no building is allowed over water, except for specified percentages of covered moorage structures. 7.07(2)(A)(6)(b), at 7–43.

8. Mining (ch. 7.08): Prohibited. 7.08(2)(A)(6), at 7–51.

9. Outdoor Advertising and Signs (ch. 7.09): Prohibited except for one flush wall–mounted sign. 7.09(2)(A)(6), at 7–59.

10. Piers and Docks (ch. 7.10): Should not locate in estuaries and biologically productive marshlands. 7.10(1)(B)(1)(c), at 7–64.

11. Ports and Industry (ch. 7.11): Should not be located in areas of high environmental value. 7.11(1)(B)(4), at 7–72.

12. Recreation (ch. 7.12): Unique and fragile areas, including estuaries, should be preserved for less intensive forms of recreation. 7.12(1)(C), at 7–80. Estuaries shall be utilized only for nonintensive, nonstructural, and nonextractive recreation activities. 7.12(2)(B)(4), at 7–84. In addition, recreational development should be compatible with adjacent and surrounding land and water uses. 7.12(1)(E)(1), at 7–81. And even in less special aquatic areas, motorized vehicles, except for launching and emergency purposes, are prohibited, 7.12(2)(B)(5)(c), at 7–84, and auxiliary use facilities must be located inland. 7.12(1)(D)(2), at 7–81.

13. Residential Development (ch. 7.13): Prohibited. 7.13(2)(A)(6), at 7–94.

14. Scientific and Educational Resources (ch. 7.14): Use of the property may not conflict with or adversely affect the purpose, character, or value of the resources and adjacent scientific educational sites. 7.14(2)(B)(4), at 7–102.

15 and 16. Shore Defense Works (ch. 7.15) and Shoreline Stabilization and Flood Protection (ch. 7.16): Not relevant.

17. Transportation Facilities (ch. 7.17): Should not adversely affect estuaries, natural wetlands, marshes, natural resources, fish, shellfish, and wildlife and migratory routes. 7.17(1)(A)(6), at 7–118.

18. Utilities (ch. 7.18): Should not adversely affect natural resources, fish, shellfish, and wildlife and migratory routes, 7.18(1)(A)(5), at 7–126, and should be located to avoid natural wetlands, estuaries, and tidelands. 7.18(1)(B)(4), at 7–127.

19. Variances (ch. 10): Limited to relief from specific bulk, dimensional or performance standards. Master Plan 10.01 (as amended). An additional criterion for granting a variance is that "the design of the project

will be compatible with other permitted activities in the area and will not cause adverse effects to adjacent properties or the shoreline environment designation." 10.03, at 10–1.

WILLIAMS, C.J., DIMMICK and PEARSON, JJ., and CUNNINGHAM, J. Pro Tem., concur.

UTTER, J. (concurring)—I concur in the result reached by the majority. It would be futile for The Orion Corporation to be required to apply for a permit for development it does not wish to pursue and that they certainly would not get.

The majority opinion suggests that a taking may have occurred simply because Orion can find no present, possible and reasonably profitable use for its tideland property. At least one commentator discussing whether shoreline regulation may result in an uncompensated taking notes that property rights in privately owned tidelands may not be identical to those in privately owned uplands. Crooks, *The Washington Shoreline Management Act of 1971*, 49 Wash. L. Rev. 423, 456 (1974). Even prior to enactment of the Shoreline Management Act of 1971, the extent to which Orion would have been able to develop its tideland property is unclear. Article 17 of the Washington Constitution vests ownership of tidelands in the State. However, disposal of tidelands by the State is subject to the public interest in navigation and the fishery. *Hill v. Newell*, 86 Wash. 227, 231, 149 P. 951 (1915), quoting *People v. California Fish Co.*, 166 Cal. 576, 138 P. 79, 82–83 (1913); *see generally* Johnson & Cooney, *Harbor Lines and the Public Trust Doctrine in Washington Navigable Waters*, 54 Wash. L. Rev. 275, 285–87 (1979); Corker, *Thou Shalt Not Fill Public Waters Without Public Permission—Washington's Lake Chelan Decision*, 45 Wash. L. Rev. 65, 73–76 (1970).

We also need not rule on the admission of a portion of the affidavit by attorney Peter Buck. As the majority concedes, experts are not to state opinions of law. Comment, ER 704. It may not be correct that Mr. Buck's opinion that any permit application would be a futile gesture is a factual matter. Such an opinion would seem to be a legal opinion

and, along with other legal opinions in the affidavit, should be disregarded by the trial judge. This is not critical to the case, however, because the other evidence overwhelmingly establishes Orion's contentions.

DORE, J. (dissenting)—While I concur with the majority on the standing issue, I dissent from the remainder of the opinion. The majority has effectively repealed the Shoreline Management Act of 1971, RCW 90.58, by eliminating the requirement that a shoreline land developer must first exhaust administrative remedies before seeking redress through the courts. I also believe it was prejudicial error to admit the Buck affidavit because it constituted a legal opinion rather than a factual presentation.

## EXHAUSTION OF REMEDIES

The rule is that when an adequate administrative remedy is provided, it must be exhausted before the courts will intervene. *Wright v. Woodard,* 83 Wn.2d 378, 381, 518 P.2d 718 (1974). This rule is based upon the belief that the courts should give proper deference to that body possessing expertise in areas outside the conventional experiences of judges. *Retail Store Employees Local 1001 v. Washington Surveying & Rating Bur.,* 87 Wn.2d 887, 906, 558 P.2d 215 (1976). This is especially true when the relevant issues involve technical matters peculiarly within the competence and special skills of an administrative authority. *Sunny Brook Farms v. Omdahl,* 42 Wn.2d 788, 793, 259 P.2d 383 (1953). Land use decisions fall within this category especially when we consider the mandate from the Legislature in the form of the Shoreline Management Act of 1971 (SMA), RCW 90.58.010 *et seq.*

## LEGISLATIVE BACKGROUND

The SMA was a response to the finding of the Legislature that the "shorelines of the state are among the most valuable and fragile of its natural resources and that there is great concern throughout the state relating to their utilization, protection, restoration, and preservation." RCW

90.58.020. The Legislature concluded that it is "the policy of the state to provide for the management of the shorelines of the state by planning for and fostering all reasonable and appropriate uses." RCW 90.58.020. To implement this policy, the Legislature provided that initial decisions regarding shoreline development would be made by local government. RCW 90.58.140(2). In this instance, the local administrative authority is the Skagit County Planning Commission. Skagit County Shoreline Management Master Program (SCSMMP) ch. 8.03. The Skagit County Board of County Commissioners has the authority to grant or deny permits after considering the recommendations of the Commission. SCSMMP ch. 8.04(1)(a). If variances or conditional use permits are involved, the Department of Ecology has review authority. RCW 90.58.140(12). Finally, permit decisions are always appealable to the Shorelines Hearings Board, RCW 90.58.180—an expert body due deference on the subject of appropriate shoreline land use. *Department of Ecology v. Ballard Elks Lodge 827*, 84 Wn.2d 551, 556, 527 P.2d 1121 (1974). This is the structure created by our Legislature for evaluating a proposed development of a state shoreline.

## PADILLA BAY

It is against this legislative mandate that we must evaluate The Orion Corporation's decision to forgo formal governmental review of any development proposal. Padilla Bay is a tideland with significant ecological value. It has been recognized as a shoreline of statewide significance by our Legislature. *See* RCW 90.58.030(2)(e)(ii)(E). The Orion Corporation (Orion) began purchasing property in Padilla Bay in the 1960's. Over the years it claims it has considered several plans to develop its property. Its original intent was to build a Venetian–style resort community. It also considered diking and draining the property and using it as farmland. It explored the possibility of various forms of aquaculture such as oyster and clam harvesting. It even considered the possibility of a duck hunting club. Yet, none

of these proposals was ever submitted to Skagit County for review. In all the years Orion has owned the Padilla Bay property, it has *never once filed for a substantial development permit.*

Nevertheless, Orion now asserts that overregulation of its property has resulted in a taking. The issue before us is not the impact of the SMA and other legislation on the value of Orion property, but whether adequate administrative remedies are available for Orion to pursue. In other words, are the remedies within the SMA and SCSMMP capable of alleviating the claimed harm caused by the regulatory programs?

While I recognize Orion property is highly regulated, an adequate administrative remedy is available. As a preliminary matter, it must be stressed that Orion property is not part of the Padilla Bay Estuarine Sanctuary; therefore, the sanctuary regulations do not directly apply to it. All parties agree that the primary regulatory authority is the Skagit County Shoreline Management Master Program. As the majority states, the SCSMMP, through the mechanism of a conditional use permit, is authorized to allow aquaculture. SCSMMP ch. 7.02(2)(A)(6)(3), (B)(11). The criteria are strict but they are not impossible for Orion to meet. For example, I do not interpret SCSMMP ch. 11.03(c) to mean that *all* of Orion property must be left undeveloped in order to be compatible with sanctuary activities. The degree to which the sanctuary impacts on Orion land is not certain. A conditional use could be allowed if it was sufficiently removed from sanctuary property. In addition, it is important to note that one of the policies of the SMA is to recognize and *protect private property rights* consistent with the public use. RCW 90.58.020.

Orion asserts that aquaculture is not an economic use of its land, but that issue is not before us. An adequate administrative remedy is one capable of alleviating the harm. *Ackerley Communications, Inc. v. Seattle,* 92 Wn.2d 905, 602 P.2d 1177 (1979), *cert. denied,* 449 U.S. 804 (1980). A remedy is available which would allow Orion to use its

property. Unless Orion can demonstrate the basis for an exception, it should be required to exhaust its administrative remedies.

Washington recognizes that in certain limited situations administrative remedies need not be pursued. *South Hollywood Hills Citizens Ass'n v. King Cy.*, 101 Wn.2d 68, 677 P.2d 114 (1984). Orion raises a claim of futility. While the record indicates the State is interested in preserving Padilla Bay, the fact remains that the regulations which directly impact on Padilla Bay allow for a conditional use. The criteria for determining whether a conditional use shall be permitted are general and allow for some degree of discretion by the decision makers. In addition, any aggrieved party has the right to appeal a decision to the Shorelines Hearings Board. RCW 90.58.180.

Admittedly Orion land is highly regulated; however, I do not agree that the regulations mean that Orion is absolutely foreclosed from using its land. Therefore, the parameters of what Orion can and cannot do with its property should be made by the administrative body possessing the expertise to make the decision. The effect of the majority's holding is to allow a developer to choose to bypass the administrative process. As long as the developer is able to demonstrate his land is highly regulated, he need not ever submit a concrete proposal to formal governmental review before claiming a taking. By refusing to require the exhaustion of administrative remedies, the majority has effectively nullified the procedural requirements of the SMA.

In addition, I do not believe that Orion should be exempt because it has tacked a 42 U.S.C. § 1983 claim onto its complaint. Orion raises a claim under 42 U.S.C. § 1983 and argues that even if there are administrative remedies available, it is exempt from exhausting them. *Patsy v. Board of Regents,* 457 U.S. 496, 73 L. Ed. 2d 172, 102 S. Ct. 2557 (1982). *Patsy* held that a 42 U.S.C. § 1983 claimant is not required to exhaust its administrative remedies before

bringing an action; however, the holding is limited to actions brought in federal courts.

BUCK AFFIDAVIT

Peter Buck is an attorney primarily engaged in land use work. Orion submitted his affidavit as support for its position. The affidavit is a highly persuasive piece of evidence; in fact, it is the only evidence which merges the facts and harmonizes the interplay of the regulations and draws a legal conclusion. Buck says:

4. Based on my years of experience in regard to coastal zone regulations and my review of the regulations and other documents set forth above, I conclude as follows:

4.1 Orion will never be granted a substantial development permit to develop its Padilla Bay property for any economically productive use under the Shoreline Management Act as enacted and under Skagit County's Master Program as enacted and since amended by that County.

4.2 A substantial development permit cannot lawfully be granted Orion for economically productive use of its Property. In the extraordinary case that Skagit County disregarded its own Master Program and issued Orion a substantial development permit, such a permit would to a certainty be appealed by the State or by a concerned environmental group, and the Shoreline Hearings Board and courts would have no choice but to overrule such a permit as in violation of the Master Program, the Shoreline Management Act, and regulations under it.

Clerk's Papers, at 212–13. Buck continues:

9. Having concluded that Orion would never be issued a substantial development permit under the use regulations of Skagit County's Master Program, I looked to the Program's provisions for variances set forth in ch. 10. Orion would not be granted a variance. . . .

10. The Master Program provides for conditional uses in chapter 11. Orion would not be granted a conditional use permit.

Clerk's Papers, at 216. In effect, Buck has engaged in the same type of analysis as a trial judge. The rule is that

experts are not authorized to render opinions of law or mixed opinions of fact and law. Comment, ER 704.

Yet, the trial judge admitted the affidavit, stating the objection went to its weight and not admissibility. This was prejudicial error. We cannot say that this error did not affect or presumptively affect the outcome of the motion, *Brown v. Spokane Cy. Fire Protec. Dist. 1,* 100 Wn.2d 188, 196, 668 P.2d 571 (1983).

CONCLUSION

Orion has administrative remedies available to request the development of its property. The majority here, by its decision in ruling Orion need not exhaust its administrative remedies, establishes a dangerous precedent which, in effect, emasculates the Shoreline Management Act of 1971, RCW 90.58, by eliminating the requirement that a shoreline land developer must first exhaust administrative remedies before seeking redress through the courts. The majority here ignores the carefully drafted procedural safeguards that the Legislature has provided to protect our shorelines, and legislates to effectuate an unjustified exemption.

I would also hold that it was prejudicial error to admit the Buck affidavit upon which the trial judge based much of his reasoning in sweeping aside the doctrine that administrative procedure should be exhausted before seeking relief in court.