[No. 60080-5.   En Banc.   February 10, 1994.]

MAREN CHRISTENSEN, *Appellant*, v. RICHARD S. MUNSEN, *Respondent*.

236

*Danielson Harrigan & Tollefson,* by *G. Van Tollefson* and *Sharon Hazzard* (*Terry A. Wallace,* of counsel), for appellant.

*Williams, Kastner & Gibbs,* by *Mary H. Spillane,* for respondent.

MADSEN, J. — The main issue presented is whether the trial court erred in allowing one of plaintiff's treating physicians to testify as a defense witness in this medical malpractice action. We hold that no error occurred and affirm the judgment of the trial court in favor of the defendant.

### FACTS

From August 11, 1980, until June 8, 1987, Seattle ophthalmologist Richard Munsen, the defendant herein, treated Maren Christensen, the plaintiff herein, for pars planitis and its complications. Pars planitis is an inflammation of the eye and both its cause and cure are unknown. The disease generally occurs in children and young adults and "burns out" after several years. If the complications of pars planitis can be controlled, the prognosis is good. One complication of pars planitis is cystoid macular edema (CME), which is a swelling of the retina. CME causes the central vision to become blurred and fuzzy, and, if untreated, can lead to permanent central vision loss and legal blindness. Another possible complication of pars planitis is glaucoma, an elevated pressure of the eye that ultimately leads to optic nerve damage and vision defects if not treated.

While under the defendant's care, plaintiff developed CME secondary to her pars planitis. The defendant treated plaintiff's CME first with oral steroids and then with steroid injections. In October 1982, the defendant injected Depo-Medrol, and in April 1983 he injected Kenalog. When plaintiff returned to defendant a few months later, she had elevated pressure in both eyes. The defendant noted that plaintiff was a probable "steroid responder", or a person who has temporary eye pressure increases—temporary glaucoma—after being given steroids.

Over the course of the next 5 years, the defendant administered Depo-Medrol and then Kenalog in an attempt to cure plaintiff's pars planitis and CME. During this time, plaintiff's eye pressures fluctuated. The plaintiff last visited the defendant on June 8, 1987. By this time her eye pressures were up and were not going down as they had previously. The defendant wanted another glaucoma specialist to recommend a course of action and referred plaintiff to Dr. Richard Mills, a professor in the ophthalmology department at the University of Washington who subspecializes in glaucoma.

When Dr. Mills saw plaintiff on July 27, 1987, her eye pressures had increased significantly, and Dr. Mills' diagnosis was severe intractable glaucoma secondary to pars planitis. Plaintiff then underwent a lengthy series of surgeries and continuing steroid treatment to control her eye pressures and to remove membranes and cataracts.

On November 13, 1989, plaintiff filed suit against the defendant, alleging that she was legally blind as a result of his failure to follow the standard of care required of an ophthalmologist in Washington. The main issue at trial was whether plaintiff's glaucoma and resulting legal blindness were caused by the defendant's injections of Kenalog or by the plaintiff's underlying eye disease, pars planitis. Plaintiff also sought to show that the defendant failed to obtain her informed consent before administering Kenalog.

After 4 hours of deliberation, the jury returned a verdict in favor of the defendant. Plaintiff then filed an appeal which the Court of Appeals certified to this court pursuant to RCW 2.06.030(d). Five issues are presented dealing with the admission of expert testimony and certain instructional rulings. Plaintiff does not, however, challenge the sufficiency of the evidence.

I

The principal issue is whether the trial court erred in allowing one of the plaintiff's treating physicians to testify as an expert witness for the defense. At trial, Dr. Mills testified for the defense regarding the cause of plaintiff's

glaucoma and vision loss. Dr. Mills stated that he thought the glaucoma was related more to plaintiff's pars planitis than to her steroid treatment. Before he testified, plaintiff acknowledged in an offer of proof that Dr. Mills could testify for the defense regarding medical facts acquired during the course of her treatment, but argued that adverse opinion testimony would breach his fiduciary duty toward her. Plaintiff makes the same claim here in challenging the admission of Dr. Mills' testimony.

▆▆ We recently addressed this issue in *Carson v. Fine*, 123 Wn.2d 206, 867 P.2d 610 (1994), and concluded that a treating physician may testify as to both fact and opinion in a medical malpractice action regardless of whether the physician is a defense or plaintiff's witness. Such testimony is admissible because a patient waives the physician-patient privilege upon filing a medical malpractice action. RCW 5.60.060(4)(b); *Randa v. Bear*, 50 Wn.2d 415, 421, 312 P.2d 640 (1957). Once the physician-patient privilege is waived, it constitutes a waiver of all of a physician's knowledge of the physical condition asked about. *Carson*, at 216; 8 John H. Wigmore, *Evidence* § 2390, at 861 (1961).

▆ As we stated in *Carson*, the fiduciary nature of the physician-patient relationship is not an independent basis to preclude a treating physician's testimony once the patient-physician privilege has been waived. While a physician assumes certain obligations in treating and advising a patient, these obligations do not include refraining from offering adverse testimony against a patient. The physician has an independent duty to testify honestly and truthfully in a court of law, be it in favor of the plaintiff or the defense. *See Carson*, at 218-19.

The need for truth outweighs any residual privacy interest stemming from the physician-patient relationship once a patient puts his or her medical condition at issue by filing suit. *See Torres v. Superior Court*, 221 Cal. App. 3d 181, 187, 270 Cal. Rptr. 401, 404 (1990); *Orr v. Sievert*, 162 Ga. App. 677, 680, 292 S.E.2d 548 (1982). At that point, a treating physician may offer truthful testimony regarding

the condition at issue regardless of which party the testimony benefits. " 'Absent a privilege no party is entitled to restrict an opponent's access to a witness, however partial or important to him, by insisting upon some notion of allegiance.' " *Carson,* at 220 (quoting *Doe v. Eli Lilly & Co.,* 99 F.R.D. 126, 128 (D.D.C. 1983)). We thus conclude, pursuant to our analysis here and in *Carson,* that the trial court did not err in allowing one of plaintiff's treating physicians to offer opinion evidence in favor of the defense.

Plaintiff also challenges Dr. Mills' testimony on the basis that it violated the trial court's own orders concerning expert testimony. On February 1, 1991, the court ruled that each party would be limited to one expert per specialty area, not to exceed two experts per specialty. The five specialty areas were pars planitis, glaucoma, pharmacology, economics, and rehabilitation. After designating its experts, the defense noted that it hoped to call Dr. Mills as well, without having him count as one of its five experts.

On June 24, the court ruled that Dr. Mills could testify, but informed the defense that if he were called,

he is your expert for the purpose of expressing opinions. You can call Dr. Mills for the purpose of expressing his facts as to what he did in his treatment, but if you are going to offer opinions as to causation or standard of care, then he is your expert and you have called him.

Report of Proceedings (June 24, 1991), at 14. Plaintiff contends that pursuant to this order, both parties could call only one expert to testify as to causation or standard of care, and that the defense violated the order by allowing two experts to testify regarding the cause of her glaucoma. She also contends that, pursuant to its orders, the court should have barred other duplicative expert testimony.

The defense responds that if this is a proper reading of the court's order, then plaintiff violated it as well, since two of her experts offered causation testimony. Furthermore, in her designation of witnesses, plaintiff noted her intent to question three of her experts about the standard of care and two about the defendant's treatment of her glaucoma.

Under the plaintiff's current reading, such testimony would clearly violate the court's order regarding expert testimony.

It makes more sense to view the court's order regarding Dr. Mills in its proper context; that is, as a decision to allow Dr. Mills to serve as the defendant's glaucoma expert instead of Dr. Drance, the glaucoma expert initially designated. In keeping with her original ruling of one expert per specialty issue, the judge on June 24 was informing the defense that if it called Dr. Mills, he was its one expert on glaucoma—on its cause and on the defendant's role in its development. Thus, multiple testimony regarding causation and standard of care would not violate the court's order if it came from different specialty area experts, which it did in this case.

██ ██ The admissibility and scope of an expert's testimony is a matter within the court's discretion. *Bruce v. Byrne-Stevens & Assocs. Eng'rs, Inc.*, 113 Wn.2d 123, 130, 776 P.2d 666 (1989); *Orion Corp. v. State*, 103 Wn.2d 441, 462, 693 P.2d 1369 (1985). Similarly, the admissibility of cumulative evidence lies within the trial court's discretion. *Mullin v. Builders Dev. & Fin. Serv., Inc.*, 62 Wn.2d 202, 206, 381 P.2d 970 (1963); *Sons of Norway v. Boomer*, 10 Wn. App. 618, 620-21, 519 P.2d 28 (1974). The specialty areas in this case were highly technical and also interrelated. The trial court may have deemed some cumulative testimony helpful to the jury's understanding of the issues, and some similar responses may have been unavoidable given the fact that several ophthalmologists testified. In any case, both parties' witnesses produced overlapping testimony to a limited extent, and the court did not abuse its discretion in allowing such testimony.

In a related argument, plaintiff contends that the court erred in allowing Dr. Mills to testify because the defendant originally chose Dr. Drance as his glaucoma expert. Plaintiff claims she was prejudiced by the defendant's switch to Dr. Mills on the first day of trial.

Plaintiff made the same argument when the trial court ruled that Dr. Mills could testify as a defense witness. The

court responded that she had known of the possibility of Dr. Mills testifying when the defense took his deposition in March, almost 3 months before the trial started on June 24. While plaintiff did not then fully examine the doctor, there was no indication that she renoted the doctor's deposition or was unable to conduct informal discovery with Dr. Mills. On April 10, a defense attorney informed the court that Dr. Mills might express expert opinions. On May 8, the trial court entered an order indicating that it would reserve, until the time of trial, the decision as to whether Dr. Mills would testify. On June 4 and June 20, the defendant again indicated his intent to have Dr. Mills testify as to expert opinions. After reciting these facts, the trial court concluded that the substitution of Dr. Drance by Dr. Mills was permissible:

> It appears to me that the plaintiffs have known about Dr. Mills for a considerable period of time. He is a treating physician. They are free to talk to him at any time and arrange informal discovery. His opinions were evident to them as of March 28, 1991 and they were free to follow up on those if they chose to.

Report of Proceedings (June 24, 1991), at 30. When plaintiff pursued her objection, the court responded that she had shown no prejudice resulting from the decision to call Dr. Mills.[1] Plaintiff cites no authority to show that the trial court abused its discretion in concluding that the switch from Dr. Drance to Dr. Mills did not prejudice her case. We conclude that the trial court properly allowed Dr. Mills to testify regarding medical facts and causation opinions and that his testimony neither violated the trial court's orders nor impermissibly prejudiced the plaintiff's case.

---

[1]The defendant points out that the only prejudice plaintiff now claims was that her trial preparations were based on Dr. Drance rather than Dr. Mills. Plaintiff knew, however, that the trial court would not be ruling on whether Dr. Mills could testify until the first day of trial. She now claims that Dr. Mills refused her request to contact her, and attaches an affidavit dated April 10, 1992, to her opening brief as support. This affidavit was not presented to the trial court and may not now be considered by this court. *State v. Murphy*, 35 Wn. App. 658, 662, 669 P.2d 891 (1983), *review denied*, 100 Wn.2d 1034 (1984); *State v. Armstead*, 13 Wn. App. 59, 66, 533 P.2d 147 (1975).

## II

Plaintiff next argues that the trial court erred in denying her motion to limit closing argument concerning a possible cause of her eye pressure increases. Before closing arguments began, plaintiff brought a motion in limine seeking to prevent the defense from arguing to the jury that an increase in aqueous humor production caused by the steroid's suppression of inflammation could have caused plaintiff's eye pressure increases. The plaintiff argued that while two experts had testified regarding such a theory, the theory's application to her was pure speculation.

The court denied the plaintiff's motion, pointing out that it had instructed the jury that the remarks, statements, and arguments made were intended to help the jury understand and apply the law. The jury was further instructed that "you should disregard any remarks, statement or argument that is not supported by the evidence or the law as given to you by the judge." Report of Proceedings (July 8, 1991), at 17. The court added that it would be up to the jury to decide which party was correct and which had the more plausible explanation for the testimony.

■ An attorney's argument may include reasonable inferences from the evidence admitted at trial. *State v. Ciskie*, 110 Wn.2d 263, 283, 751 P.2d 1165 (1988); *State v. Hunter*, 35 Wn. App. 708, 715, 669 P.2d 489, *review denied*, 100 Wn.2d 1030 (1983). At trial, two ophthalmologists testified that the reduction of inflammation caused by steroids could cause increased aqueous humor production and an increase in eye pressures. Defense counsel was properly allowed to refer to this testimony during closing argument as a possible explanation of plaintiff's eye pressure increases.

## III

Plaintiff next contends that the trial court erred in refusing her proposed instructions regarding standard of care and informed consent. At trial, plaintiff introduced a study which found elevated eye pressures following only 1 of 3,000 steroid injections. Plaintiff's reason for introducing the

study was that it cited a series of cases showing that Kenalog caused elevated pressures more often than other steroids. The defense pointed out, however, that other parts of the study showed that this observation may have resulted from a faulty sampling. Moreover, it was the defense on cross examination which initially referred to the study's 1 in 3,000 figure. In response to this figure, plaintiff proposed the following instructions:

> [T]he fact that a possible risk associated with care and treatment of [a] patient [is small] does not excuse an ophthalmologist from his obligation to inform the patient of that risk and to obtain the informed consent of a patient before providing treatment to that patient. . . . [T]he fact that a possible risk associated with the care and treatment of a patient is small, does not excuse an ophthalmologist from his obligation to exercise reasonable prudence in the care and treatment of his patient.

Report of Proceedings (July 8, 1991), at 9.

Plaintiff stated that these proposed instructions were based on *Helling v. Carey*, 83 Wn.2d 514, 519 P.2d 981, 67 A.L.R.3d 175 (1974). In *Helling*, medical experts had established during trial that the standards of the profession did not require routine glaucoma tests for patients under 40 years of age. In her petition for review, plaintiff contended that in giving certain instructions to the jury, and in refusing her proposed instructions on standard of care, the trial court prevented her from arguing her theory of the case to the jury that the standard of care for ophthalmologists was inadequate to protect her, at age 32, from glaucoma. *Helling*, at 517.

The issue thus became whether the defendants' compliance with the standard of the profession insulated them from liability under the facts presented. *Helling*, at 517. The court recognized that the incidence of glaucoma in 1 out of 25,000 persons under the age of 40 might appear minimal. "However, that one person, the plaintiff in this instance, is entitled to the same protection, as afforded persons over 40 . . . .. Under the facts of this case reasonable prudence required the timely giving of the pressure test to

this plaintiff." *Helling*, at 518-19. In so holding, the court declined to discuss the plaintiff's proposed instructions. *Helling*, at 519.

■ In the present case, the trial court declined to give plaintiff's proposed instructions because, though allegedly based on *Helling*, they were not approved of in that case, and because plaintiff cited no authority stating that it would be error to refuse them. The defendant contends it would have been error to give the proposed instructions since they erroneously suggest that a physician has a duty to inform of, or act in response to, every conceivable risk, no matter how small. The guide for disclosure of a possible risk is materiality. *Smith v. Shannon*, 100 Wn.2d 26, 31, 666 P.2d 351 (1983); *Miller v. Kennedy*, 11 Wn. App. 272, 287, 522 P.2d 852 (1974), *aff'd per curiam*, 85 Wn.2d 151, 152, 530 P.2d 334 (1975). The court in the present case so instructed the jury, and correctly added that "[a] material fact is one to which a reasonably prudent patient in the position of the plaintiff would attach significance in deciding whether or not to submit to the proposed course of treatment." Clerk's Papers, at 207. *See Smith*, at 31.

■ ■ The trial court's refusal to give the proposed instructions was also proper because the study was not sufficient, in and of itself, to support these two jury instructions. A trial court is only compelled to submit instructions to a jury where there is substantial evidence to support the claim. *Adams v. State*, 71 Wn.2d 414, 427, 429 P.2d 109 (1967); *Thompson v. Groves*, 68 Wn.2d 790, 791, 415 P.2d 648 (1966). The defense provided no other support for the 1 in 3,000 figure, and plaintiff argued that the figure was based on inadequate research. Plaintiff did provide other evidence to support her claims of inadequate warnings and substandard care, and the court offered seven instructions to the jury that discussed the defendant's duties regarding standard of care and informed consent. See instructions 7, 8, 9, 10, 12, 14, 15; Clerk's Papers, at 199-208. Pursuant to these instructions, plaintiff was able to argue to the jury that defendant breached the standard of care and his duty

of informed consent by injecting Kenalog and by not informing her of the possibility that the steroid might cause glaucoma. Thus, unlike the plaintiff in *Helling*, the plaintiff here was able to argue her theory of the case to the jury under the instructions given. Accordingly, the court did not err in declining to give her proposed instructions.

## IV

The plaintiff next argues that the trial court erred in giving instruction 13 on after-acquired knowledge. Instruction 13 reads as follows:

> A defendant is not to be judged in the light of any after-acquired knowledge in relation to the case, and the questions of whether or not a defendant-physician failed to comply with the standard of care and/or failed to inform the patient, as defined elsewhere in these instructions, are to be determined by what was known or should have been known, in relation to the case at the time of the treatment in question and must be determined by reference to the pertinent facts then in existence of which he knew, or in the exercise of reasonably prudent care should have known.

Clerk's Papers, at 206. The plaintiff excepted to the instruction on the grounds that it was being used to impeach Dr. Zimmerman, her pars planitis expert. Dr. Zimmerman was not licensed to practice ophthalmology until after the defendant treated the plaintiff.

The defense countered that the purpose of the after-acquired knowledge instruction was not to undermine Dr. Zimmerman's authority, but to make it clear to the jury that it was not to hold the defendant responsible for information acquired during plaintiff's surgeries, which occurred after he treated her. The trial court agreed that plaintiff misperceived the reason for giving the instruction and confirmed that its inclusion of the instruction was based on the later surgeries.

The plaintiff next points out that while a similar after-acquired knowledge instruction was approved in *Gjerde v. Fritzsche*, 55 Wn. App. 387, 391, 777 P.2d 1072 (1989), *review denied*, 113 Wn.2d 1038 (1990), the court approved that instruction with the admonition that the use

of the negative in the phrase "not to be judged in light of any after-acquired knowledge in relation to the case . . ." created an unnecessary risk of misapplication. *Gjerde*, at 391. However, since plaintiff did not raise this issue in excepting to the instruction before the trial court, it need not be considered here. *See Galvan v. Prosser Packers, Inc.*, 83 Wn.2d 690, 692, 521 P.2d 929 (1974); *State v. Scott*, 77 Wn.2d 246, 461 P.2d 338 (1969). We conclude that the trial court did not err in giving instruction 13 on after-acquired knowledge.

In another argument based on knowledge of plaintiff's surgeries, plaintiff claims that the trial court erred in striking from the main instruction on informed consent two paragraphs stating that defendant had a duty to advise plaintiff that her elevated eye pressures might require surgery and that the surgeries might result in inflammation and scarring.

The trial court apparently struck these paragraphs and gave the after-acquired knowledge instruction since both parties' experts testified that they had never before heard of steroids causing permanent glaucoma resulting in surgery. Plaintiff's assertions that such complications were foreseeable by the defendant are unsupported by citations to the record. We need not consider the issue further since it was made without assignment of error, without citations of relevant authority, and without references to the record. *See Painting & Decorating Contractors of Am., Inc. v. Ellensburg Sch. Dist.*, 96 Wn.2d 806, 815, 638 P.2d 1220 (1982); *State v. Peerson*, 62 Wn. App. 755, 777, 816 P.2d 43 (1991), *review denied*, 118 Wn.2d 1012 (1992).

V

The final issues presented are whether the trial court erred in giving instructions 11 and 12, the "no guarantee/ poor result" and "error in judgment" instructions. At trial, plaintiff excepted to these instructions on the basis that they were unwarranted and were a comment on the evidence. Instruction 11 provided as follows:

> An.ophthalmologist does not guarantee the results of his or her care and treatment. A poor medical result is not, in itself, evidence of negligence.

Clerk's Papers, at 204.

■ Instruction 11 is based on Washington Pattern Instruction (WPI) 105.07. The comment thereto states that the giving of a "no guarantee/poor result" instruction does not constitute error if it is used to supplement a proper standard of care instruction. 6 Wash. Prac., *WPI*, at 523 (1989) (citing *Watson v. Hockett*, 107 Wn.2d 158, 166-67, 727 P.2d 669 (1986)). Whether or not to give this type of instruction is a matter within the trial court's discretion. 6 Wash. Prac., at 523; *Seattle Western Indus., Inc. v. David A. Mowat Co.*, 110 Wn.2d 1, 9, 750 P.2d 245 (1988). If the court determines that the "no guarantee/poor result" instruction is appropriate, *Watson* suggests that the following language be used:

> A doctor does not guarantee a good medical result.

> A poor medical result is not, in itself, evidence of any wrongdoing by the doctor.

*Watson*, at 164; 6 Wash. Prac., at 523.

■ It is undisputed that instruction 11 followed a proper standard of care instruction. See instruction 10; Clerk's Papers, at 203. Moreover, the evidence supported giving the instruction, since the main issue at trial was whether plaintiff's blindness was the result of defendant's treatment or her underlying eye disease. Plaintiff now contends that the instruction given was worded improperly, since it substituted "negligence" for the word "wrongdoing" suggested by *Watson*. Since plaintiff did not except to the wording of the instruction at trial, that claim will not be considered here. *See Galvan*, at 692; *Scott*, at 246.

Plaintiff also excepted to instruction 12, which stated as follows:

> A physician is not liable for an error of judgment if, in arriving at that judgment, the physician exercised reasonable care and skill, within the standard of care the physician was obliged to follow.

Clerk's Papers, at 205.

█ Instruction 12 is based on WPI 105.08. The comment thereto cites *Watson* in stating that giving an "error of judgment" instruction does not constitute error. 6 Wash. Prac., at 525; *see also Miller v. Kennedy*, 91 Wn.2d 155, 160, 588 P.2d 734 (1978). This instruction only applies, however, when there is evidence that in arriving at a judgment, the physician exercised reasonable care and skill within the standard of care he or she was required to follow. Moreover, its application will ordinarily be limited to situations in which the doctor is confronted with a choice among competing therapeutic techniques or among medical diagnoses. 6 Wash. Prac., at 525 (citing *Watson*, at 165). Finally, an error in judgment instruction supplements the standard of care and can only be given with a proper standard of care instruction. 6 Wash. Prac., at 525; *Watson*, at 166.

In the present case, one defense expert testified that the defendant treated plaintiff appropriately and properly injected her with Kenalog as well as Depo-Medrol. Another defense expert testified that he would have also used Kenalog, while Dr. Zimmerman testified that he would have relied exclusively on Depo-Medrol. Thus, there was evidence that the defendant acted within the standard of care required of ophthalmologists as well as evidence that he had a choice of therapeutic techniques. The error in judgment instruction closely followed the court's standard of care instruction and was appropriately worded. See instruction 10; Clerk's Papers, at 203; *Watson*, at 164-65.

█ An instruction which does no more than accurately state the law pertaining to an issue does not constitute an impermissible comment on the evidence by the trial judge under Const. art. 4, § 16. *Hamilton v. Department of Labor & Indus.*, 111 Wn.2d 569, 571, 761 P.2d 618 (1988); *State v. Ciskie*, 110 Wn.2d 263, 282-83, 751 P.2d 1165 (1988). Instructions 11 and 12 accurately stated the law as set forth by this court in *Watson* and thus did not constitute comments on the evidence. We conclude that the trial court did not err in giving instructions 11 and 12, the "no guarantee/poor result" and "error in judgment" instructions.

250

Having resolved the issues presented in favor of the defendant, we affirm the judgment of the trial court in his favor.

ANDERSEN, C.J., and DOLLIVER, DURHAM, SMITH, and GUY, JJ., concur.

JOHNSON, J. (dissenting) — I disagree with the majority's holding regarding the primary issue in this case for the reasons expressed in the dissenting opinion in *Carson v. Fine*, 123 Wn.2d 206, 867 P.2d 610 (1994) (Johnson, J., dissenting). Therefore, I dissent.

UTTER and BRACHTENBACH, JJ., concur with JOHNSON, J.