659 So.2d 886 (1995)
James Tate KNOTTS, A Minor, By Judy T. KNOTTS, as Mother and Next Friend
v.
J.F. HASSELL, M.D. and Laurel Family Clinic, P.A.
No. 91-CA-01263-SCT.
Supreme Court of Mississippi.
August 10, 1995.
*888 Robert G. Germany, Pittman Germany Roberts & Welsh, Jackson, Crymes G. Pittman, Pittman Germany Firm, Jackson, for appellant.
J. Robert Ramsay, Bryant Clark Dukes Blakeslee Ramsay & Hammond, Hattiesburg, Nancy E. Steen, Hattiesburg, for appellee.
Before HAWKINS, C.J., and PITTMAN and BANKS, JJ.
HAWKINS, Chief Justice, for the Court:
James Tate Knotts filed suit, by and through his mother Judy T. Knotts, against Dr. J.F. Hassell, Dr. C.A. Hollingshead, and the Laurel Family Clinic, P.A., on July 1, 1987, in the circuit court of the Second Judicial District of Jones County alleging medical malpractice. On September 21, 1987, the trial court granted the plaintiff's motion for leave to amend the original complaint, and Jones County Community Hospital was added as a defendant. Thereafter, the plaintiff settled his claim against the hospital, and the claim against Dr. Hollingshead was dismissed.
Trial began September 23, 1991, following which the jury returned a verdict in favor of the defendants. James has appealed. We affirm.

FACTS
Judy Knotts became pregnant during 1978. On the morning of January 18, 1979, she arrived at the Jones County Community Hospital in labor. She was monitored and examined by Dr. Hassell at approximately 7:00 a.m. By 9:30 a.m., Judy had not made a great deal of progress, and Dr. Hassell ordered a pelvimetry (i.e. x-ray) to determine if her bone structure would allow for a vaginal delivery. The radiologist informed Dr. Hassell that Judy's pelvis was adequate for a vaginal delivery.
Around 11:00 a.m., Dr. Hassell conferred with Dr. Hollingshead by telephone. They agreed that Judy should be taken to the delivery room so that the baby's head could be rotated in order to facilitate delivery. The plaintiff contended that at this time Pitocin was administered to Judy. Pitocin is used to stimulate uterine contractions during labor. A side effect, however, is that under certain circumstances it may result in reduced blood flow to the fetus. Dr. Hassell disputed whether Judy had been given Pitocin at this time.
At approximately 11:45 a.m., Dr. Hassell attempted to rotate the baby, and being unsuccessful, he telephoned Dr. Hollingshead. Dr. Hollingshead attempted to rotate the baby, but was also unsuccessful. The doctors then concluded that a caesarean section was necessary. James was delivered by caesarean at 1:05 p.m. Hospital records indicate that at 1:07 p.m. Judy was given Pitocin in order stimulate the delivery of the placenta. Approximately seven hours after his birth, James began experiencing seizures. He was transferred to Women's Hospital in Jackson where he was diagnosed with cerebral palsy and retardation.
The trial developments will be discussed with the legal issues raised.

LAW

A. SECOND AMENDED COMPLAINT
On September 4, 1991, James sought to amend his complaint to include a claim against St. Paul Fire and Marine Insurance Company, the insurer of the defendant physicians, alleging "deliberate misrepresentation of the facts by the defendant physicians with full knowledge and consent of St. Paul and their attorney." The basis of the motion was a transcript of an August 25, 1987, conversation between Drs. Hassell and Hollingshead and their attorney, which the plaintiff did not discover until the deposition of a defense *889 expert on July 31, 1991. According to James, both doctors admitted during the initial conversation with their attorney that Judy had received Pitocin while still in labor, and which both doctors later denied in discovery depositions. The trial court denied the motion to amend as being both untimely and failing to state a claim.
Mississippi Rule of Civil Procedure 15(a) states that leave to amend pleadings should be freely granted by the trial court "when justice so requires," and this Court in turn reviews the lower court's decision upon an abuse of discretion standard. McDonald v. Holmes, 595 So.2d 434, 435 (Miss. 1992). In the instant case, James discovered the matter which he claims warranted an amendment on July 31, 1991. However, he failed to seek to amend his pleadings until September 4  over a month later and within nineteen days of the scheduled trial. Having known these additional facts for over a month, the failure to seek to amend until less than three weeks before trial was not prompt. See Natural Mother v. Paternal Aunt, 583 So.2d 614, 617 (Miss. 1991) (holding that party must exercise "due diligence in filing [motion] to amend"). The circuit judge did not abuse his discretion in denying James' motion to amend as untimely.
Moreover, the motion to amend failed to state a claim. The conversation between Drs. Hassell and Hollingshead and their attorney occurred on August 25, 1987, i.e. shortly after suit was filed and more than eight years after the alleged malpractice. At the time of the conversation, the doctors claimed that they thought Judy had received Pitocin during her labor, and they were merely instructing their attorney on the normal procedures for its administration. The transcript itself contains no indication that the doctors and their attorney had a scheme to deliberately misrepresent the facts of the case. At trial Dr. Hassell stated that he had a conversation with his attorney on August 25, 1987, and had assumed Judy was given Pitocin during labor. After reviewing the records, however, Dr. Hassell stated that, while he could not be certain, he did not believe Judy had received Pitocin before delivery. Dr. Hollingshead also testified that, at the time of the August, 1987, conversation with their attorney, he had assumed Pitocin had been administered, but that he and Dr. Hassell later concluded it was probably not given.
Consequently, James' claim of a deliberate attempt to misrepresent the facts lacks any foundation. The most that can be said is that at the time of the conversation between the doctors and their attorney, the physicians could not recall with any certainty the events leading up to James' birth. However, before their depositions were taken and before trial, the doctors reviewed the medical records dealing with James' birth and came to the conclusion that their initial impressions had been incorrect. At best, the conversation with the attorney was a contradictory statement which could have been  and was  used to impeach the credibility of the physicians. There is simply no indication in the transcript of the August 1987 conversation from which any reasonable person could conclude that there was a scheme to commit fraud. See Grantham v. Mississippi Dept. of Corrections, 522 So.2d 219, 221 (Miss. 1988) (holding that claim should be dismissed if it appears beyond doubt that plaintiff could not prove facts to support his claim).
Besides the factual frailties contained in James' motion to amend, it is also doubtful that the claim he sought to assert was legally cognizable. In essence, plaintiff sought to hold the doctors and the insurance company liable for perjured statements they made during the doctors' depositions. Although this Court has failed to address this issue previously, several other states have refused to allow a civil suit for damages suffered as a result of perjury. See e.g. Regal Marble, Inc. v. Drexel Investments, 568 So.2d 1281, 1282-83 (Fla. Dist. Ct. App. 1990); Lawson v. Hensley, 712 S.W.2d 369, 370 (Ky.App. 1986); John Allan Co. v. Brandow, 59 Ill. App.2d 328, 207 N.E.2d 339, 342 (Ill. App. 1965); Brewer v. Carolina Coach Co., 253 N.C. 257, 116 S.E.2d 725, 727-28 (1960); W.G. Platts, Inc. v. Platts, 73 Wash.2d 434, 438 P.2d 867, 871-72 (1968). In the opinion of the courts which have taken this position, no civil action may be based upon perjured testimony due to the fact that such testimony is absolutely *890 privileged. Regal Marble, 568 So.2d at 1282-83. This Court has long recognized the absolute privilege that is attached to relevant statements made during the course of judicial proceedings. Gunter v. Reeves, 198 Miss. 31, 21 So.2d 468 (1945); Verner v. Verner, 64 Miss. 321, 1 So. 479 (1887). In order to facilitate the policy concerns supporting the privilege  namely to encourage open and honest communication  we adopt the position of our sister states by finding that no civil action may be based upon perjured testimony.

B. JUROR CHALLENGES
During jury selection, James sought to have two members of the venire excused for cause due to their relationships with the various defendants. The judge refused. Thereafter, James exercised two of his peremptory challenges and the jurors were excused. On appeal he contends that the trial judge's refusal to dismiss the jurors for cause is reversible error.
In American Creosote Works of Louisiana v. Harp, we held, "[b]efore the trial court could be put in error for denying a challenge for cause the record should show that the complaining party exhausted his peremptory challenges." 215 Miss. 5, 60 So.2d 514, 518 (1952); see also Chapman v. Carlson, 240 So.2d 263, 268 (Miss. 1970). Here, James used his peremptory challenges to strike the two offensive veniremen  thus obviating any potential prejudice as a result of the court's ruling. As James has failed to raise a specific objection to any of the actual jurors, this assignment of error is without merit.
James also attempts to attack the impartiality of the entire venire. Specifically, he contends that 38% of the venire had some relationship to the defendants, and that this "statistical aberration" warrants reversal under the Court decision in Hudson v. Taleff, 546 So.2d 359 (Miss. 1989). In Hudson, the Court ruled that the plaintiff was denied a fair trial as 48% of the venire had some connection with the defendant. 546 So.2d at 363. However, the Court also stated:
Given the statistical aberration in the jury pool, the judge could have done several things to ameliorate its prejudicial effect: (1) he could have afforded counsel additional peremptory challenges, (2) he could have increased the size of the available venire as well as affording additional challenges, or (3) he could have sustained at least some of the challenges for cause.
Id. (citing Mhoon v. State, 464 So.2d 77, 81 (Miss. 1985)). In the instant case, the trial judge took all the curative measure outlined in Hudson. During jury selection, James was granted two additional peremptory challenges, and before trial the judge elected to increase the size of the venire. Furthermore, several veniremen were in fact excused for cause by the trial judge. James has failed to raise specific objections with respect to any member of the actual jury, and there is no merit to this claim.

C. EXPERT TESTIMONY
During the course of discovery, the defense took the depositions of two plaintiff's experts in the field of maternal/fetal medicine, Drs. Richard Davis and James Quirk. Thereafter, the plaintiff took the depositions of two defense experts specializing in the same field, Drs. John Morrison and Frank Bohem. At a pretrial hearing that followed, the trial judge observed that both parties had indicated that both of their experts would be called during trial. Seeking to avoid the presentation of cumulative testimony, the judge instructed the parties to select their best expert in each medical field to testify at trial. There was no objection or protest by either party at the time the court made this ruling.[1]
*891 At trial James elected to call Dr. Quirk as his expert in maternal/fetal medicine. Dr. Quirk testified that he did not believe Dr. Hassell had violated the standard of care. The testimony of Dr. Davis was not offered after that of Dr. Quirk. The only mention of Dr. Davis' testimony was the following colloquy which occurred at the close of the plaintiff's case-in-chief:
MR. PITTMAN:
Your Honor, basically, I know the ruling on this already, but the Court has a local rule we know and understand and appreciate to limit experts within a single discipline to one expert within that discipline, and just for the record, we would tender Dr. Richard Davis who we previously listed in accordance with the expert answers he gave in his deposition.
MR. RAMSAY:
If they want to tender him, Judge, let them put him on. I will state before the court 
THE COURT:
 I have already ruled on that, Gentlemen. I don't need to hear anything further on that.
MR. PITTMAN:
Yes, sir, I know you ruled, but I just wanted to make a record, Judge.
During the defense's case-in-chief, James objected to the testimony of a defense expert, contending that it would be cumulative. The defense proffered the testimony of the expert to the court outside the presence of the jury. After listening to the proffer, the judge found that testimony would not be cumulative and allowed the expert to testify.
On appeal, James makes three challenges to the trial court's rulings with regards to experts. First, he asserts that the trial court's decision to limit cumulative medical testimony was erroneous. Miss.R.Evid. 403, nonetheless, expressly allows a trial judge to exclude evidence which he finds to be cumulative. See also Clark v. City of Pascagoula, 507 So.2d 70, 76 (Miss. 1987) (holding that trial judge did not abuse his discretion by excluding cumulative evidence); Christensen v. Munsen, 123 Wash.2d 234, 867 P.2d 626, 630 (1994) (holding that trial court could limit cumulative medical evidence). The touchstone of Rule 403 is whether or not the evidence  of whatever type  is cumulative, and if evidence is in fact cumulative it is within the discretion of the court to exclude said evidence.
Second, James contends that he should have been allowed to present the testimony of Dr. Davis after he had already called Dr. Quirk to testify. Specifically, James asserts that although both doctors were experts in the same field they would have nonetheless given different (i.e. non-cumulative) testimony. However, James failed to make a proffer of Dr. Davis' testimony when the trial court refused to allow the testimony at trial.[2] Had he done so it is entirely possible that the trial judge would have recognized the alleged non-cumulative nature of Dr. Davis' testimony and reconsidered its prior ruling. The court did just that during the course of the defense's case-in-chief. The anemic efforts of the plaintiff to get Dr. Davis' testimony before the court, however, were totally insufficient. In the absence of a meaningful proffer, we cannot place the lower court in error. See Wirtz v. Switzer, 586 So.2d 775, 784 (Miss. 1991) (holding that exclusion of evidence will not be basis for reversal in absence of proffer). Furthermore, assuming arguendo that James *892 did manage to proffer Dr. Davis' deposition testimony, the Court cannot discern that any prejudice resulted due to the exclusion of the testimony, as Dr. Davis refused to find fault with treatment rendered by Dr. Hassell.
Third, James argues that the trial court failed to apply its order with respect to experts in an evenhanded manner. Specifically, he contends that the judge allowed two defense experts to give cumulative testimony. Dr. Charles Knight, a neonatologist, testified as both a fact witness and an expert for the defense. As a neonatologist, Dr. Knight stated that he was responsible for the care and treatment of newborn infants until the time of their discharge from the hospital. The substance of Dr. Knight's testimony focused upon whether James had suffered from oxygen deprivation during labor and delivery. He concluded that James had not suffered from oxygen deprivation on the day he was born. Dr. Mark Scher, a pediatric neurologist and an expert in infant seizures, was also allowed to testify after the court concluded that his testimony would not be cumulative. The substance of Dr. Scher's testimony dealt with the potential causes of the seizures that James experienced shortly after his birth  a matter that Dr. Knight's testimony did not address.[3] Consequently, there is no merit to James' contention. By allowing physicians from two different fields to give non-cumulative testimony on two totally different subjects, the trial judge did not violate his own ruling with respect to cumulative testimony.

D. JUROR MISCONDUCT
During voir dire, the trial judge made the following statement to the potential jurors:
Do not discuss anything that you have heard in this case. I know that we had two potential jurors who said they had been discussing some of the things. Maybe I didn't make it clear, but you are not to discuss among yourselves at this time anything about this case, period.
You will be advised as to when you are to discuss this case with each other as far as the facts and the law are concerned.
The actual jurors were frequently reminded of the court's admonition during the course of the trial. Nonetheless, James contends that the jurors violated the judge's instruction.
A short time after the trial concluded, Juror Williamson authored an article that appeared in the Laurel newspaper. In the article, he recounted some of the events that transpired during his service, stating:
Even through 4 1/2 days, there was no time we had what I would call bad arguments. Once or twice, we had some spirited discussions which involved questions, and I understand once we got too loud, but we never had any trouble with one another.
... .
I nicknamed the oldest member of our group "Preacher" because when we weren't talking about the case, he was talking about the Lord and the Bible.
James contends that these remarks indicate that the jury was improperly discussing the case before retiring. However, there is no indication as to what the "spirited discussions" were about, or when during the 4 1/2-day period they took place. In short, the article simply does not support James' assertion.
Furthermore, even if the Court assumes that juror misconduct did take place, James has failed to show that any prejudice resulted from the misconduct. In Atwood v. Lever, 274 So.2d 146, 147 (Miss. 1973), the Court refused to find error in a lower court's decision not to grant a mistrial after a juror made a casual remark to the plaintiff, and the plaintiff replied, "Thank you." The Court ruled that: "A mistrial or a new trial should not be granted on this ground [i.e. juror misconduct] in a civil case, unless the circumstances indicate some prejudice, wrongful intent, or unfairness." Atwood, at 147. The same reasoning applies to the instant case as James has failed to assert any *893 prejudice resulted from the alleged misconduct.

E. WEIGHT AND SUFFICIENCY
The central factual dispute in the case at bar was whether or not Judy received Pitocin during labor. Medical records from the day of James' birth make reference to Pitocin at 11:15 a.m. The nurse who prepared the records, Janette Price, testified at trial. She stated that the 11:15 reference to Pitocin indicated that she had prepared the Pitocin for use in the delivery of the placenta. According to Price, if Pitocin had been administered during labor that fact would have been indicated in the medical records in some detail. She also testified that Dr. Hassell never ordered that Pitocin be given during labor. At trial, Dr. Hassell stated that he did not believe Judy had received Pitocin during labor, although he could not be one hundred percent certain. James contended that the medical records demonstrated that Judy had actually received Pitocin during labor at 11:15. In any event, the determination of this matter was a proper question for the jury, which certainly could have concluded that Pitocin was not administered during labor. See Johnson v. Black, 469 So.2d 88, 90 (Miss. 1985) (holding that Court has no authority to overturn findings supported by record).
With respect to the standard of care and causation, there was also ample testimony supporting the jury's verdict. Drs. John Morrison and Charles Hollingshead both stated that they believed Judy had received quality medical care during labor. Interestingly, one of James' own experts, Dr. Quirk, even stated that he did not believe Dr. Hassell had performed below "a level of minimal competency in the rendition of obstetrical care." Furthermore, Drs. Knight and Scher stated that James' physical condition was not the result of events which occurred on the day of his birth. Accordingly, there is no merit to James' claim that the verdict was against the overwhelming weight of the evidence. See Burnham v. Tabb, 508 So.2d 1072, 1077 (Miss. 1987) (holding that jury must determine value of testimony and credibility of witnesses; refusing to overturn verdict supported by record).

CONCLUSION
James has presented the Court with no basis for reversal in this appeal. The judgment entered by the lower court in favor of the defendants is, therefore, affirmed.
AFFIRMED.
DAN M. LEE and PRATHER, P.JJ., and SULLIVAN, PITTMAN, JAMES L. ROBERTS, Jr. and SMITH, JJ., concur.
BANKS, J., concurs in result only.
McRAE, J., not participating.
NOTES
[1] In his initial brief, James contended that the trial judge had limited the parties to a single expert on the applicable standard of care, and a single expert on causation. The defense asserted that this was a mischaracterization of the court's ruling. By an order dated February 8, 1993, this Court ordered the lower court to supplement the record on this matter. At the subsequent hearing, the judge found that his prior ruling had merely limited each side to one expert in each medical field in order to prevent cumulative testimony. In his rebuttal brief, James concedes that this was the actual ruling of the lower court.
[2] James fails to demonstrate both at trial and on appeal any harm caused by the judge's ruling when the plaintiff rested. The trial took place in Jones County. Dr. Davis was a practicing physician in Birmingham, presumably where he was physically during the course of the trial. When Dr. Quirk testified, if James was not satisfied with his testimony, or somehow was caught by surprise, he should have called it to the attention of the circuit court, and asked for permission to call Dr. Davis to supply an opinion not given by Dr. Quirk. With such an explanation, the circuit judge may well have permitted counsel to call Dr. Davis in Birmingham to come over to Laurel and testify. Plaintiffs eschewed this course, however, simply stating when they rested that "we would tender Dr. Richard Davis." How? Defense counsel had previously taken his discovery deposition. Did they mean to proffer it? If so, it would have been of no benefit, because he never deposed that either Dr. Hassell or Dr. Hollingshead was negligent in any manner.

For us to find error, there must be something in the record to enlighten us.
[3] At one point during Dr. Scher's direct examination, the trial judge did in fact prohibit the doctor from testifying on a particular matter after concluding that it would be repetitious.