# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION  II

| | |
|---|---|
| STATE OF WASHINGTON, | No.  57544-2-II |
| Respondent, | |
| v. | |
| JOHN LAWRENCE BRESLIN, III, | UNPUBLISHED OPINION |
| Appellant. | |

PRICE, J. — Breslin appeals his 21 convictions for various crimes related to contact with his former girlfriend.  Breslin argues that the trial court erred in allowing the testimony of several law enforcement officers about the planning and execution of a search warrant by a special weapons and tactics team (SWAT team) because the testimony was not relevant to his convictions. Breslin also argues that the testimony of two officers should have been excluded as cumulative. And Breslin challenges the trial court's imposition of a crime victim penalty assessment (VPA) and a DNA collection fee.

We determine that the evidence Breslin challenges was relevant, and therefore admissible, because it was related to rebutting Breslin's defense theory of the case and to his charge for obstruction of a law enforcement officer.  And the evidence Breslin challenges as cumulative was admissible because it was additional information the jury had not previously heard.

We affirm Breslin's convictions.  But we remand for the trial court to strike the DNA collection fee and determine whether Breslin is indigent for purposes of striking the VPA.

FACTS

I. BACKGROUND

In September 2021, Breslin was served with a no-contact order that prevented him from contacting Kimberly LaFuente, a former girlfriend. The no-contact order also prohibited Breslin from coming within 500 feet of LaFuente or her residence.

In September and October, notwithstanding the no-contact order, Breslin and LaFuente were living together on a heavily-wooded, five-acre property. LaFuente asked Breslin to leave the property multiple times, but Breslin refused. LaFuente and Breslin had multiple altercations with each other, one of which involved a firearm and resulted in LaFuente receiving a gunshot wound.

Throughout October, LaFuente was in contact with law enforcement to try to remove Breslin from her property. LaFuente informed law enforcement that Breslin had access to LaFuente's two guns on her property (a handgun and a rifle) and was "using methamphetamine." Clerk's Papers (CP) at 73.

Law enforcement began gathering information about Breslin's criminal history and additional information about the layout of the property. Detective Peterson of the Pierce County Sheriff's Office prepared, and obtained, a warrant to search LaFuente's property to look for firearms and arrest Breslin. On November 10, 2021, the warrant was executed with the use of a SWAT team. When the SWAT team arrived, Breslin ran into the woods surrounding LaFuente's house but was soon found and arrested.

Breslin was ultimately charged with 21 different counts: one count of second degree assault, one count of fourth degree assault, two counts of second degree unlawful possession of a

firearm, one count of theft of a firearm, one count of obstruction of a law enforcement officer (based on fleeing from the SWAT team), and 15 counts of violating no-contact orders.[1]

II. BRESLIN'S TRIAL

Prior to trial, Breslin filed a motion in limine to exclude as cumulative the testimony of some of the SWAT officers. Breslin acknowledged that some of the officers may have relevant testimony but stated that the State's witness list included "a very large number of law enforcement officers," and he requested exclusion of testimony of "[a]ny officer whose testimony is substantially identical to other officers on the scene." CP at 106. Breslin argued the testimony would be "unfairly prejudicial and a waste of time [under] ER 403." CP at 106. The State responded that it had curated the witness list and cumulative evidence should not be an issue. The trial court did not make an express ruling on the motion.

The parties gave their opening statements. The State's opening statement explained that the jury would hear testimony from different SWAT team members about the events that occurred when law enforcement executed the warrant. The State did not, however, describe the scope or intensity of the SWAT team involvement in its opening statement.

During Breslin's opening statement, defense counsel referenced the State's comments about the SWAT team and then characterized the State's use of this information as trying to make Breslin out to be a "boogyman." Verbatim Rep. of Proc. (VRP) (Sept. 29, 2022) at 10. As part of this theory, defense counsel explicitly described the magnitude of the SWAT team response:

---

[1] In November, Breslin was served with another no-contact order which contained the same prohibitions as the first. While in custody, Breslin sent numerous letters to a post office box in LaFuente's name.

You've heard the State. I think the State has made Mr. Breslin to be a little bit of a boogyman, and they've already told you the day that Mr. Breslin got arrested, they came out with a SWAT team. They came out with a bunch of guys in body armor, helmets, combat boots, fatigues, assault rifles.

They came in an armored car that they call a Bear Cat. They came with snipers. They came with a canine unit. They came for Mr. Breslin with an overwhelming force because they thought he did some stuff wrong. That's what the State thinks. That's what the police thought on that day. You're not here really just to say, "Do I think Mr. Breslin did something," or, you know, that somebody thinks Mr. Breslin did something.

Your job isn't really just to sit there and just judge Mr. Breslin. In many ways, you're here to examine what the State has done. . . .

You're here to ask yourself, when the police came that day, did they make an assumption? Did they just assume that what Ms. LaFuente said was true? Did they make assumptions about the things that they saw? Were they blinded by their own conviction that Mr. Breslin was guilty that they never looked for any evidence to the contrary, that they never thought for a moment to investigate any other avenue that would lead to any other conclusion?

VRP (Sept. 29, 2022) at 10-11.

The State began its case by calling several law enforcements officers to testify, starting with Detective Petersen. Detective Petersen testified that he was the officer who prepared the search warrant. As part of preparing the warrant, Detective Peterson wrote a "threat assessment," which reviews the risks that officers may face when executing a warrant. VRP at 279. Breslin objected to this testimony, arguing that the reasons why law enforcement took their chosen actions were not relevant to Breslin's charged crimes and were inadmissible under ER 404(b). The State responded that the information was foundational and that the "defense spent a fair amount of time in [its] opening [statement] about SWAT." VRP at 280. The trial court overruled Breslin's objection.

4

Detective Peterson's testimony continued; he explained the threat assessment included a person's past contact with law enforcement, criminal history, and the involvement anyone suspected to be on the property has had with weapons. The detective explained that at a certain threat level, SWAT team involvement is discretionary, but there is a threshold where their involvement is mandatory. (Detective Peterson did not specify any of the background information used for Breslin's threat assessment or whether SWAT-team involvement was discretionary or mandatory for the execution of Breslin's warrant.) Detective Petersen explained that the execution of Breslin's warrant involved 15 to 20 SWAT team members and an armored van.

The State called a second officer to testify, Detective dos Remedios, who was a sniper included in the SWAT team response. While testifying about the general response planning process, Detective dos Remedios specifically pointed out that whether the scene will likely include weapons is a critical factor for whether a SWAT team should be involved.

The State asked Detective dos Remedios specifically what "considerations were made" in the execution of Breslin's warrant, and Breslin objected, based on relevance, a lack of foundation, and cumulativeness. VRP at 370. The trial court essentially sustained the objection, agreeing that a foundation for the detective's direct knowledge had not been laid.

The State then asked Detective dos Remedios if he knew why a SWAT team response was needed to serve the warrant in this case, and Breslin said, "[S]ame objection." VRP at 371. The trial court again essentially sustained the objection, responding, "What I want to avoid is any reference to [ER] 404(b), and we are getting awfully close to that. So I need the questions to be directed in a way that elicits the information, but does not put information before the jury that they should not be hearing." VRP at 371.

Detective dos Remedios then testified about his observations on the day the warrant was executed, including seeing someone running the opposite direction of him, despite law enforcement's announcements for Breslin to "come out." VRP at 374. He stated that he had placed himself in the woods behind LaFuente's house and that his role was to provide the SWAT team with information from the heavily-wooded back property. After the other SWAT team members began responding, Detective dos Remedios heard someone running across a flat area and into the trees. As Detective dos Remedios saw the subject running away, he informed other SWAT members. Detective dos Remedios described the person he saw, including describing a jacket and the person's stature and build, but he did not specifically identify Breslin.

The State next called Deputy Coggin, another member of the SWAT team. Deputy Coggin explained his involvement and said he saw a man with facial hair on-scene, but he also did not identify Breslin.

During a break the next day, and before additional SWAT team members testified, Breslin requested to readdress his motion in limine about limiting law enforcement testimony. Breslin specifically objected to two of the witnesses the State intended to call that day, Deputy Seavey and Deputy Nielsen, arguing their testimony would be cumulative because Breslin anticipated they were not going to provide any new information to the jury.

The State responded that Deputy Nielsen would provide different, additional information about events at the scene of Breslin's arrest and that both officers could testify "that it was John Breslin" at the property. VRP at 541.

The trial court determined that the State could call the officers to testify about Breslin's identity and for the State to "fill the gaps" in its explanation about what happened on the property

that led to Breslin's arrest, but, to prevent cumulative testimony, the trial court said it would not allow additional testimony about the reasons the SWAT team was present. VRP at 545. With those restrictions, the trial court allowed the testimony.

The State continued its case with the testimony of Deputies Nielsen and Seavey. Deputy Nielson briefly testified, explaining that he was a tactical team leader for the SWAT operation and was part of a search team that looked for Breslin after he fled LaFuente's property. The deputy also identified Breslin in the court room, recognizing him from both the day of his arrest and a prior law enforcement contact.

Deputy Seavey testified that he was a member of the SWAT entry team and searched the house and outbuildings on LaFuente's property. Deputy Seavey also testified that he heard a negotiator on-scene announcing Breslin's name numerous times over a loud speaker. But the deputy testified that he did not see anyone on the property, and he did not specifically identify Breslin.

Both LaFuente and Breslin also testified. LaFuente testified consistent with the facts above. She also testified that she owned two firearms and Breslin usually carried her handgun. Testifying for the defense, Breslin also said that on the date of his arrest there were two firearms, owned by LaFuente, on the property.

The jury returned verdicts of guilty on all 21 counts and found via a special verdict form that Breslin used a firearm for the second degree assault. The trial court sentenced Breslin to 164 months in total confinement. The trial court also imposed a $500 VPA and a $100 DNA collection fee. The judgment and sentence did not indicate a finding on whether Breslin was indigent, but the trial court separately entered an order of indigency for the purposes of an appeal.

Breslin appeals.

ANALYSIS

I. CHALLENGE TO OFFICER TESTIMONY

Breslin argues that the trial court erred in allowing officer testimony during his trial that was not relevant to his charges and was cumulative. We disagree and determine the trial court did not abuse its discretion when it admitted the testimony.

We review the trial court's decision to admit or exclude evidence for an abuse of discretion. *State v. Gunderson*, 181 Wn.2d 916, 922, 337 P.3d 1090 (2014). An abuse of discretion occurs when the decision was manifestly unreasonable or based on untenable grounds or reasons. *Id*. We also consider whether a reasonable judge would rule as the trial judge did. *Id*. The trial court's evidentiary rulings can be affirmed on any grounds supported by the record and the law. *State v. Grier*, 168 Wn. App. 635, 644, 278 P.3d 225 (2012).

A. TESTIMONY ABOUT SWAT THREAT ASSESSMENT AND RESPONSE WAS RELEVANT

Breslin argues the trial court erred in allowing officers to testify about how the threat assessment was conducted for a potential SWAT team response because that evidence was not relevant to any of his charged crimes but, rather, was propensity evidence intended to portray him as a criminal who would have committed the crimes. Breslin also argues that the details of the warrant execution (including the description of about 20 SWAT members in military style uniforms with helmets and weapons and that a large armored vehicle was used for announcements to contact Breslin) were not relevant to his charged crimes.

Under the rules of evidence, relevant evidence is admissible. ER 402. " '[R]elevant evidence' " is that which has "any tendency to make the existence of any fact that is of consequence

to the determination of the action more probable or less probable than it would be without the evidence." ER 401. "[C]omments made during opening statement can open the door to otherwise inadmissible evidence." *State v. Broussard*, 25 Wn. App. 2d 781, 792, 525 P.3d 615 (2023).

Here, Breslin explained during his opening statement his defense theory that the State was going to try, apparently inappropriately, to make Breslin look like a "boogyman." VRP at 10. As part of his explanation of the defense, Breslin specifically highlighted the intensity of the SWAT team response during the arrest, stating,

> You've heard the State. I think the State has made Mr. Breslin to be a little bit of a boogyman, and they've already told you the day that Mr. Breslin got arrested, they came out with a SWAT team. They came out with a bunch of guys in body armor, helmets, combat boots, fatigues, assault rifles.

> They came in an armored car that they call a Bear Cat. They came with snipers. They came with a canine unit. They came for Mr. Breslin with an overwhelming force because they thought he did some stuff wrong. That's what the State thinks. That's what the police thought on that day. You're not here really just to say, "Do I think Mr. Breslin did something," or, you know, that somebody thinks Mr. Breslin did something.

VRP (Sept. 29, 2022) at 10-11. He also directly focused the jury on scrutinizing the fairness of law enforcement's actions that day:

> Your job isn't really just to sit there and just judge Mr. Breslin. In many ways, you're here to examine what the State has done. . . .

> You're here to ask yourself, when the police came that day, did they make an assumption? Did they just assume that what Ms. LaFuente said was true? Did they make assumptions about the things that they saw? Were they blinded by their own conviction that Mr. Breslin was guilty that they never looked for any evidence to the contrary, that they never thought for a moment to investigate any other avenue that would lead to any other conclusion?

VRP (Sept. 29, 2022) at 11.

9

Once Breslin overtly raised, and intentionally cast aspersions on, the intensity and motivations of the SWAT team's response as part of his defense theory, the door was opened and the general reasons behind the SWAT team's involvement became relevant; the State was permitted to rebut Breslin's defense theory to show the SWAT team assessment and execution of the warrant was justified.

The testimony, both about the preparation of the warrant and the execution of it, solicited by the State was consistent with this relevant purpose. First, the circumstances about the preparation of the warrant were testified to by Detective Petersen and Detective dos Remedios. Detective Peterson explained the criteria behind a threat assessment, including any potential involvement a person on the property has had with weapons.[2] And Detective dos Remedios also testified that an important factor for whether a SWAT team is involved in a law enforcement action was whether the scene was likely to include weapons—which both LaFuente and Breslin admitted were present on the property. Given that Breslin cast doubt during his opening statement on the legitimacy of the SWAT team response, the State's questioning of Detective Petersen and Detective dos Remedios about the general procedure to determine SWAT's involvement was relevant and the trial court did not abuse its discretion by allowing the testimony.

---

[2] Breslin also argues the trial court erred in allowing testimony that should have been excluded under ER 404(b) ("evidence of [previous] crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith"). Breslin's argument is unpersuasive because he can point to no ER 404(b) evidence that was admitted at trial. The trial court was clearly aware of the risk of ER 404(b) evidence coming in and its vigilance ensured that the jury was not informed of bad acts specifically performed by Breslin—the jury was given an explanation about why SWAT teams may be present on-scene for background information, but it heard no information specific to Breslin that was used for the threat assessment.

Second, the details about the warrant's execution were also relevant to explain the SWAT response and rebut the defense theory that it was overkill. Once defense counsel itemized the scope of the response in his opening statement, the State was entitled to offer an explanation of the actual events. Moreover, not only was this evidence relevant to rebut Breslin's defense theory, a large portion of it was also relevant to one of Breslin's specific charges. Breslin's charge for "obstruction of a law enforcement officer" was based on the events surrounding Breslin's arrest when he fled the scene. Much of the testimony about the execution of the warrant was necessary for the jury to hear a complete picture of the circumstances leading to this charge and to explain how police ultimately determined Breslin fled.

In short, Breslin's own defense theory outlined in his opening statement and the specific charges Breslin faced made this limited SWAT testimony relevant.[3] Accordingly, Breslin fails to show the trial court abused its discretion in admitting the officers' testimony about both the process used to determine if a SWAT team should be involved and the actions taken during the warrant execution.

---

[3] We emphasize that even though this information was made relevant by Breslin's own defense theory and the obstruction charge, there would still be limits beyond which the prejudicial impact, including its potential misuse by the jury as propensity evidence, would outweigh its relevance. We note, however, that under the specific facts of this case, any prejudicial impact was reduced by the presence of firearms on the property (which both Breslin and LaFuente conceded in their testimony). As the detectives' testimony made clear, the presence of firearms was a significant factor in whether SWAT would be involved. By giving the jury an explanation for the need for SWAT involvement from this admitted evidence, the risk was minimized of the jury misusing the evidence and speculating about other hypothetical and potentially prejudicial explanations.

B. Challenged Testimony Was Not Cumulative

Breslin also argues the trial court erred in admitting the testimony of Deputies Nielsen and Seavey because it was cumulative. We disagree.

Even if relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice or a needless presentation of cumulative evidence. ER 403. The trial court has considerable discretion when handling cumulative evidence. *Carson v. Fine*, 123 Wn.2d 206, 226, 867 P.2d 610 (1994); *Christensen v. Munsen*, 123 Wn.2d 234, 241, 867 P.2d 626 (1994).

When Breslin moved to prevent Deputies Nielsen and Seavey from testifying based on cumulativeness, the trial court sustained, in part, and overruled, in part, his objection. The trial court ordered that duplicative testimony about the general considerations behind the threat assessment or warrant execution would not be allowed. But the trial court allowed testimony about Breslin's identity and for the State to fill in gaps in its narrative of how Breslin was moving through the property.

From our review of the record, both Deputies Nielsen and Seavey testified consistently with the trial court's prudent limitations. Both deputies only briefly explained their involvement in the case and then gave new information about Breslin's movements on the property that other testimony had not included. And Deputy Nielsen specifically identified Breslin as the person present on the property, which had not previously been done by any other witness. Thus, Breslin's argument that this testimony was cumulative fails. *See Christensen*, 123 Wn.2d at 241 (explaining that even if some evidence is somewhat cumulative, it may be "helpful to the jury's understanding of the issues, and some similar responses may have been unavoidable . . . .").

Because the trial court did not abuse its discretion in admitting law enforcement testimony, we affirm Breslin's convictions.

## II. VPA AND DNA COLLECTION FEES

Breslin also asks us to remand for the trial court to strike the VPA and the DNA collection fee. The State has no objection to remanding for that purpose.

Effective July 1, 2023, the VPA is no longer authorized for indigent defendants. LAWS OF 2023, ch. 449 § 1; RCW 7.68.035(4). The legislature also removed authorization for the DNA collection fee. LAWS OF 2023, ch. 449 § 4; RCW 43.43.7541. And changes to the legislation governing LFOs apply to cases on direct appeal when the change was enacted. *State v. Ellis*, 27 Wn. App. 2d 1, 16-17, 530 P.3d 1048 (2023). Because Breslin's case is still on direct appeal, these legislative changes apply to Breslin. On remand, the trial court should strike the DNA collection fee. But because the trial court did not make a finding in the judgment and sentence on whether Breslin was indigent, the trial court should determine whether Breslin is indigent and if the VPA should also be stricken.

## CONCLUSION

We affirm Breslin's convictions. But we remand for the trial court to strike the DNA collection fee and determine whether Breslin is indigent for purposes of striking the VPA.

No. 57544-2-II

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

PRICE, J.

We concur:

MAXA, P.J.

CHE, J.